IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
**Chief Judge Wiley Y. Daniel**

Civil Action No.  10-cv-01633-WYD-BNB

HEALTHONE OF DENVER, INC., a Colorado corporation;
HCA-HEALTHONE LLC, a Colorado limited liability company,

      Plaintiffs,

v.

UNITEDHEALTH GROUP INCORPORATED, a Minnesota corporation,

      Defendant.

---

## ORDER ON MOTION FOR SUMMARY JUDGMENT

---

I.    <u>INTRODUCTION</u>

THIS MATTER is before the Court on the Motion for Summary Judgment filed on

January 6, 2012 by Defendant UnitedHealth Group Incorporated ["Defendant" or

"UnitedHealth"].  A response was filed on March 13, 2012, and a reply was filed on April

3, 2012.  The motion is thus fully briefed.

By way of background, Plaintiffs HealthONE of Denver, Inc. and HCA-

HealthONE LLC [collectively "Plaintiffs" or "HealthONE"] filed their Verified Complaint

and Jury Demand on July 9, 2010.  The Complaint asserts claims of trademark

infringement in violation of § 32 of the Lanham Act, 15 U.S.C. § 1114, unfair competition

in violation of § 43 of the Lanham Act, 15 U.S.C. § 1125(a), deceptive trade practices in

violation of Colorado's Consumer Protection Act ["CCPA"], common law trademark

infringement, and common law unfair competition.

The Complaint alleges that the lawsuit is "intended to stop United's unlawful use of HealthONE's trademarks and to recover damages for that unlawful use.  United has used HealthONE's trademarks to benefit from HealthONE's reputation and good will as the preeminent provider of hospital and related healthcare services in Colorado and the Rocky Mountain region, which has caused irreparable harm to HealthONE's reputation and good will."  (Verified Compl. ¶ 1.)  HealthONE seeks injunctive and monetary relief against UnitedHealth.  (*Id.* ¶ 2 and in "Relief Sought".)

UnitedHealth argues in its summary judgment motion that Plaintiffs' claims of trademark infringement and related claims fail because the evidence is insufficient as a matter of law for a reasonable jury to find a likelihood of confusion between the trademarks at issue.  It also argues that the CCPA claim fails as a matter of law.  HealthONE asserts in response that Defendant's motion fails because there exist substantial, albeit disputed, facts upon which a reasonable jury could, and likely will, find that there is a likelihood of confusion between the marks at issue as well as a violation of the CCPA.

II.   FACTUAL BACKGROUND

I first note that the parties tendered voluminous facts and evidence in this case.  I have not discussed every fact tendered by the parties, only those that are most material to my findings.  I have, however, reviewed and considered all the facts and evidence in support of same.  In so doing, I have construed the evidence in the light most favorable to HealthONE as the nonmoving party in connection with my review of Defendant's summary judgment motion.  *Anaya v. Crossroads Managed Care Sys., Inc.*, 195 F.3d

584 (10th Cir. 1999).  When I cite to a party's exhibit, I refer to it as "Def.'s Ex. __" or

"Pls.' Ex. __".  Where the facts are unsupported by evidence, are argumentative and/or

are conclusory, I have disregarded those facts.  Also, where the facts are undisputed, I

have not cited to the record.

     <u>Information about the Parties</u>

     HealthONE provides health care related services in Colorado and the Rocky

Mountain region.  (Def.'s Ex. 14 at 2-3.)  It is not an insurer.  (Pls.' Ex. 23, Dep. of Linda

Kanamine ["Kanamine Dep."] at 151:19-22.)  HealthONE currently operates seven

hospitals, including approximately 13 ambulatory surgery centers, over sixty outpatient

care facilities, and approximately 20 diagnostic imaging centers under the HealthONE

mark.  (*Id.*)  All are in the Denver-metro area.  It also provides preventative health and

wellness education, conducts wellness screenings, and operates health fairs and other

wellness programs.  HealthONE asserts that it has numerous world renowned programs

and affiliated physicians (Pls.' Ex. 27, Rule 30(b)(6) Dep. of Linda Kanamine at 18:7-

19:11.)

     As the largest hospital system in the Denver metropolitan area, HealthONE

serves approximately 800,000 patients per year from all fifty states and internationally.

On an average annual basis, HealthONE serves approximately 20,000 patients from

outside Colorado.  Under the terms of a managed care contract, UnitedHealth's

insureds can obtain health care services from HealthONE.  Indeed, one of

UnitedHealth's subsidiaries, UnitedHealthcare, has designated two HealthONE facilities

as "Premium Cardiac Speciality Centers."

HealthONE also provides services to patients in several surrounding states, including Wyoming, Montana, North Dakota, South Dakota, Kansas, Nebraska, and Utah.  (Pls.' Ex. 22, Dep. Of HealthONE designated representative Linda Kanamine at 133:17-134:17; Pls.' Ex. 24; Ex. 25, Rule 30(b)(4) Dep. of Linda Kanamine at 41:13 to 42:13.)  One of the ways in which HealthONE provides such services is through HealthONE Outreach Services, a volunteer-based program that offers education and clinical services, without charge, to rural and outlying communities.  HealthONE Outreach Services operates in Wyoming, South Dakota, Nebraska, Kansas, Colorado, North Dakota, Montana, New Mexico, Arizona, Utah, and Texas.  Another way in which services are provided outside Colorado is through AirLife Denver, the emergency medical and critical care transport service of the HealthONE system.  It serves a ten state region that includes Colorado, Wyoming, Montana, Nebraska, Kansas, New Mexico, Utah, and South Dakota.

In 2010 alone, HealthONE contributed more than $190.4 million in community benefits, which included uncompensated and charity care, health professional education, community building activities, community health education, cash donations to charities, research, and taxes.  HealthONE provides financial support and sponsorship to numerous organizations such as Opera Colorado, the Denver Center for Performing Arts, Project Cure, the Denver Broncos, the Colorado Avalanche, the Denver Nuggets, the Colorado Rapids, and the Colorado Mammoth.  In 2003, the Denver Business Journal named HealthONE the best large company to work for in Denver.  Also, in 2010

the Association of Air Medical Services named AirLife Denver the Air Medical Program of the year.

Defendant UnitedHealth is a publicly traded, diversified insurance and services company, offering numerous products and services through a large number of subsidiaries and affiliates.  UnitedHealth cites its Annual Report in support of its assertion that health insurance represents approximately 93% of UnitedHealth's 2010 revenues (Def.'s Ex. 1 at 22, 24), although Plaintiffs deny this percentage. UnitedHealth's "Health Benefits" platform is known as "UnitedHealthcare," which includes its Employer & Individual insurance business.  UnitedHealth provides health insurance coverage in two distinct ways:  (a) "group policies," in which employees are insured through their employers; and (b) "individual policies", in which individual consumers purchase insurance for themselves and their families.

UnitedHealth presents evidence that the individual insurance products, marketed under the UnitedHealthOne mark, are designed for the self-employed, unemployed, or those whose employers do not offer group health benefits.  (Def.'s Ex. 2, Decl. of Michael L. Corne ["Corne Decl."] at ¶ 3.)  It also markets products branded with the UNITEDHEALTHGROUP name to a broader audience consisting of individuals under the age of 65 who do not have group health insurance in the state where those policies are sold, people who have insurance but want to switch to an individual plan, former customers of group insurance plans, and independent insurance brokers.

UnitedHealth's "Health Services" platform is branded as "Optum" and includes three diversified businesses:  (a) OptumHealth, focusing on health management and

wellness, clinical services and financial services; (b) OptumInsight, specializing in technology, consulting and business outsourcing solutions; and (c) OptumRx, providing pharmacy benefit management solutions.  UnitedHealth presents evidence that its main competitors in the market for individual insurance products are HumanaOne, CoventryOne, Aetna, Anthem/Wellpoint, and Assurant, which Plaintiffs do not dispute. Plaintiffs point out, however, that those are not UnitedHealth's only competitors.  (Def.'s Ex. 4, UnitedHealth's Trademark Registration).

According to Linda Kanamine, the Vice-President of Public Affairs, Marketing, and Government Affairs for HCA-HealthONE LLC, while UnitedHealth is an insurer and HealthONE provides services in health, wellness and education, the companies deal with the same topics and probably the same people.  (Pls.' Ex. 14, Aff. of Linda Kanamine ["Kanamine Aff."] at ¶ 3; Pls.' Ex. 23, Kanamine Dep. at 151:12-15.) UnitedHealth also provides preventative health and wellness resource and education, and offers personal health assessments to improve risk areas and avoid future health problems.  UnitedHealth asserts that it does not, however, provide these services under the UnitedHealthOne mark.

UnitedHealth, through various Optum subsidiaries, owns and operates medical groups, clinics, urgent care centers, and ambulatory surgery centers.  Through its various subsidiaries, UnitedHealth employs physicians and more than 500 nurse practitioners who provide health care services.  It also partners with 50,000 physicians in California.  UnitedHealth admits these facts, but denies the implication that any of the patient care services are provided under the UnitedHealthOne mark.

Further, through various Optum subsidiaries, UnitedHealth owns and manages various physician networks.  It also establishes, manages, contracts with physicians, and supplies technology to provide online health care services for health care clinics in retail settings such as Wal-Mart.  Also through various subsidiaries, UnitedHealth contracts with providers and nurse practitioners to provide care for chronically ill patients, and to provide nursing home, palliative care, and hospice services. UnitedHealth provides such provides hospice services in Colorado.  Again, while UnitedHealth admits these facts, it denies the implication that any of the patient care services are provided under the UnitedHealthOne mark.

UnitedHealth attempted to purchase a group of approximately 80 physicians in the Denver metropolitan area.  HealthONE also cited deposition testimony from one of its executives, Jeff Dorsey, that UnitedHealth employs or sponsors physicians who treat patients in Denver.  (Pls.' Ex. 53, Dep. of Jeffrey Dorsey ["Dorsey Dep."] at 65:4-24.) Mr. Dorsey testified that, in his opinion, the activities of UnitedHealth with regard to sponsoring or supporting primary care physicians is a competitive threat to HealthONE, as it "would be in competition to primary care physicians who work for HCA-HealthONE".  (*Id.* 67:15-68:22.)  Also, the Senior Vice President for Managed Care at HealthONE testified in his deposition that UnitedHealth is moving into the delivery of services, acquiring physician practices or medical groups in other cities.  (Pls.' Ex. 28, Dep. of Leonard Kalm ["Kalm Dep."] at 36:11-38:10.)

According to UnitedHealth's website "About", "UnitedHealth Group is a leading health care company, serving more than 75 million people worldwide.  [Its] family of

companies touches nearly every aspect of health care, helping people live healthier lives." (Pls.' Ex. 54.)  UnitedHealth also markets services in advertising campaigns such as "Grow Healthy" and "Health-in-Numbers" that refer to disease management, health care services, and its ability to make people healthier.  (Pls.' Ex. 55.)  These campaigns also, however, refer to "health plans" and insurance, and UnitedHealth asserts that these campaigns make clear that its business is insurance.

HealthONE markets its products and services in the following ways:  internet, newspaper, webcasts, health fairs, television ads, magazine ads, magazines, billboards, direct mailings, telephone book listings, yellow page listings, posters, books, and booklets.  HealthONE advertises its services in Colorado as well as nationally and internationally (Pls.' Ex. 22, Dep. of HealthONE representative Linda Kanamine at 73:6-74:15), although UnitedHealth argues that the national/international advertising is minimal.  UnitedHealth markets, advertises, or promotes the products sold under the UNITEDHEALTHONE brand in the following ways: brochures, flyers, mailings, television and radio commercials, print advertisements, kiosks and billboards, and internet websites.  UnitedHealth offers products branded with the name UNITEDHEALTHONE in most areas of the United States.

HealthONE spends approximately $7 to $10 million annually on marketing.  According to Ms. Kanamine, it markets to "anyone . . . alive", including past users of healthcare services, probable or potential healthcare service users, physicians, employers, the insured and uninsured, other regions, sports participants, . . ." (Pls.' Ex. 23, Kanamine Dep. at 197:6-20.)  UnitedHealth spends $40 million annually on

marketing, $4.9 million of which is spent on UNITEDHEALTHONE products and services.  Since September 4, 2008, UnitedHealth has distributed approximately 37 million direct mailings in the form of letters and postcards displaying the UNITEDHEALTHONE brand to producers, current customers, and prospective customers.  UnitedHealth has spent approximately $2.7 million on such direct mailings.

Ms. Kanamine testified that HealthONE and UnitedHealth market to very similar customers.  (Pl.'s Ex. 23, Kanamine Dep. at 42:21-43:3.)  UnitedHealth points out in response that this is only Ms. Kanamine's opinion on the issue, and there is no evidence that Ms. Kanamine has any knowledge about UnitedHealth's customers or their similarity to those of HealthONE.

Ms. Tarrant, the Chief Executive Officer ["CEO"] of HealthONE's Sky Ridge Medical Center, testified on behalf of HealthONE that to her knowledge UnitedHealth is referred to as "United" or "United Healthcare"; she was not aware of the name "UnitedHealth Group".  (Pls.' Ex. 47, Dep. of Maureen Tarrant ["Tarrant Dep."] at 78:8-14; *see also* Pls.' Ex. 28, Kalm Dep. at 43:20-44:1, wherein Mr. Kalm, the Senior Vice President for Managed Care at HealthONE, testified that he refers to Defendant as "United", "UnitedHealthCare" or "UHC".)  UnitedHealth points out in response that the evidence shows only how these two HealthONE representatives personally refer to it, and not to any knowledge in the health care community about how UnitedHealth is referenced.  Further, it points out that HealthONE has not identified any instances in which UnitedHealth has advertised or publicly held itself out under the name "United."

HealthONE also asserted in its response that UnitedHealth did not produce evidence of a single business registration in any state for the trade name "UnitedHealth".  In reply, Defendant presented evidence that it has had a federally registered "UnitedHealth" trademark since 2009.  (Def.'s Ex. 34.)  Defendant also asserts that it has registered and used dozens of registered marks with combinations of "UnitedHealth" and another word, including UnitedHealth Access, UnitedHealth Performance, UnitedHealth Advisors, and UnitedHealth Passport.  (*Id.*)

**HealthONE's Trademarks**

Plaintiff HCA-HealthONE LLC owns six federally registered trademarks:  (a) Reg. No. 1,307,559 for typed drawing mark "HEALTH ONE"; (b) Reg. Nos. 2,334,897 and 2,439,860 for design marks incorporating the words Health and ONE and a stylized banner as shown on page 11 of the Motion for Summary Judgment  ("Banner Mark"); (c) Reg. No. 2,904,672 for typed drawing mark "1-877-HEALTHONE"; (d) Reg. No. 3,617,397 for the standard character mark "HEALTHONE"; and (e) Reg. No. 3,620,820 for stylized mark incorporating the word "Health" in block letters and the word "One" in cursive letters on page 11 of the Motion for Summary Judgment ("Cursive Mark"). Since the filing of the Complaint, HealthOne has acquired two additional federal trademark registrations for HEALTHONE EXPRESS CARE and HEALTHONE EMERGENCY CARE, and has recently filed a service mark application for HEALTHONE 24 HOUR EMERGENCY CARE.

Through a predecessor entity, HealthONE first used the HEALTHONE® Marks in 1983.  Four of the HEALTHONE® Marks have been in continuous use for more than

five years post-registration.  The HealthONE mark is not used to market any insurance products, whether group or individual.

HealthOne has presented evidence that it regularly monitors third party use of the HEALTHONE® Marks with the United State Patent and Trade Office ["USPTO"], the internet, trade and industry publications, trade and industry events, trade shows, health fairs, newspapers, and advertisements offered in any medium.  (Pls.' Ex. 38, Opposer's Responses to Applicant's First Set of Interrogatories at Resp. 13; Pls.' Ex. 14, Kanamine Aff. ¶ 6.)  Through this evidence, it also contends that it uses all procedures, rights, and remedies afforded by the Lanham Act and the USPTO to challenge potentially offending marks.  Additionally, HealthONE uses cease and desist letters for third party uses for which no application or registration exists with the USPTO.  (*Id.*)

In support of these assertions, HealthONE presented evidence that on November 6, 1997, Bruce Sloan defaulted in a Trademark Trial and Appeal Board ["TTAB"] Opposition proceeding filed by HealthONE's predecessor entities opposing the registration of the mark 1-888-HEALTH-1 in connection with insurance services. Registration of that mark has subsequently been abandoned.

In 2004, HealthONE requested that a company called HealthONE, Inc. d/b/a USA HealthONE, Inc. stop using the name "HealthONE" in connection with marketing and offering health insurance plans.  (Pls. Ex. 62.)  In 2006, HealthONE requested that a medical association stop using the name "Health One" in connection with the provision of health care services.  (Pls.' Ex. 64.)  In June 2007, HealthONE requested that Indiana Regional Medical Center not use the name "HealthOne" in connection with

a medical care facility to be opened in Pennsylvania.  (Pls.' Ex. 65.)  In 2009,

HealthONE requested that Health One, Inc. of Wisconsin stop using the name "Health

One, Inc." in connection with pharmacy services.  (Pls.' Ex. 77.)  And in 2010,

HealthONE requested that US Health 1 of Plainview, Texas, stop using the name "US

Health 1" in connection with health insurance services.  (Pls.' Ex. 79.)[1]

On December 18, 2007, an adverse judgment was entered against Antioch

Holdings, Inc. in a TTAB Opposition Proceeding filed by HealthONE.  Plaintiffs opposed

the registration of the mark iHEALTHONE in connection with an electronic pill

dispensing product.

In 2008, HealthONE objected to Marel Norwood's use of the name "HEALTH

ONESELF" in connection with the provision of health care services and filed a Notice of

Opposition at the TTAB in 2008.  The TTAB issued an opinion in favor of HealthONE,

finding likelihood of confusion and refusing to register the name "HEALTHONESELF."

On September 16, 2008, HealthWon, Inc. defaulted in a TTAB Opposition

Proceeding filed by HealthONE opposing the registration of the mark "HEALTHWON" in

connection with health care savings accounts and health care pricing analysis.

Registration of that mark has subsequently been abandoned.

On April 2, 2009, a default judgment was entered against Antioch Holdings, Inc.

in a TTAB Opposition Proceeding filed by HealthONE.  Plaintiffs opposed the

---

[1]  Plaintiffs also offered evidence that these companies agreed to discontinue or not use HealthONE's marks.  However, this evidence (in the form of letters) constitutes inadmissible hearsay and therefore will not be considered for purposes of this summary judgment motion.  (*See* Pls.' Exs. 63, 64, 66, 78 and 80.)

registration of the mark "HEALTHONE MEDICAL SYSTEMS" in connection with "computer-controlled devices for dispensing pills and capsules sold empty."

### Adoption of the UnitedHealthOne Mark

In 2007, UnitedHealth's individual insurance policies were offered or "underwritten" by the following subsidiaries:  Golden Rule Insurance Company, American Medical Security Life Insurance Company, Oxford, MAMSI and PacifiCare. HealthONE admits this, but notes that UnitedHealth's subsidiary, UnitedHealthcare, also offers, underwrites, or administers individual health insurance policies.  (Pls.' Ex. 5.)

In mid-2007, UnitedHealth undertook an effort to adopt a single brand name to unify the marketing of its individual insurance products.  Prior to adoption of the UnitedHealthOne mark, that name had been used informally within UnitedHealth to refer to its individual insurance businesses.  UnitedHealth asserts that the UnitedHealthOne name followed convention adopted by several of its major competitors of adding a "one" to their core brand in order to identify and distinguish their individual policy business as opposed to their group policies, such as HumanaOne and CoventryOne.

Although the UnitedHealthOne name was in use internally, UnitedHealth wished to consider and test other names before committing the substantial resources required for a national rebranding effort covering several existing brands.  To that end, UnitedHealth formed a "Marketing Council" composed of leads of various departments tasked with strategic marketing decisions.  UnitedHealth engaged Great Productions Inc. ["GPI"], an external research company, to examine its then-existing branding and to make branding recommendations.  GPI provided UnitedHealth with an initial list of

potential names that might be used as an "umbrella brand" covering all individual insurance products, including Elements, Remedy, Axis, Healation, Verve, and Clarity.

Not satisfied with those initial proposed names, UnitedHealth directed GPI to conduct a detailed branding audit, competitive analysis, market segmentation, and brand identity analysis.  The efforts of GPI and the UnitedHealth Marketing Council resulted in a list of names that were considered, and four names that were approved, for further testing:  UnitedHealthOne, UnitedHealth4U, UnitedHealthConnect and EmpoweringHealth.  (Def.'s Ex. 3, Dep. of Lisa Gilbert at 132:3-138:9; Def.'s Ex. 5 at 3; Def.'s Ex. 6.)

In January of 2008, GPI reported the results of testing those four preliminary name choices among focus groups in Los Angeles, Columbus, Atlanta and Orlando, noting that the name UnitedHealthOne had been determined to best capture the idea of insurance for individuals.  The leader of the Brand Council effort, former employee Lisa Gilbert, believes that the UnitedHealthOne mark also tested better because of its connection to the parent brand, UnitedHealth, which was already widely recognized in the market.  While Plaintiffs admit this, they present evidence that another name "[r]ising to the top" and listed above UNITEDHEALTHONE was United Health4U.  (Pls.' Ex. 6 at UHO 56229.)

According to UnitedHealth, the report for the UnitedHealthOne mark commissioned by it was over 600 pages long.  It included references to the HealthONE mark along with references to dozens of federally registered marks with combinations of the words "health" and "one," including another federally registered "HealthOne" mark

that has no association with Plaintiffs.  It also listed scores of other business listings and

Internet domain names using "health one" in various permutations and combinations.

Defendant contends that this report was a trademark clearance report (Def.'s Ex. 2,

Corne Decl. at ¶ 16), which Plaintiffs deny.  Plaintiffs assert that the report was a

trademark research report.

UnitedHealth unveiled the new UnitedHealthOne branding to its employees in

April or May of 2008, and it was first used in advertising and promotion of

UnitedHealth's insurance products in September of 2008.  UnitedHealth spent a total of

$906,141.08 in selecting, clearing and launching the UnitedHealthOne mark.

### Use of the UnitedHealthOne Mark

UnitedHealth identifies the appearance of the UnitedHealthOne mark on page

seven of its summary judgment motion, and asserts that the mark has appeared in the

marketplace like that since its launch in 2008 to the present day.  While Plaintiffs do not

dispute that UnitedHealth uses its mark in the format presented in its motion, they cite

evidence which they assert shows that it also uses the standard character mark for

UNITEDHEALTHONE extensively in the marketplace. (Pls.' Exs. 8 and 9.)

UnitedHealth asserts that it uses the UnitedHealthOne mark solely in connection

with the advertising of its individual insurance policies, and that no other products or

services by any UnitedHealth division, including Optum, are sold under the

UnitedHealthOne mark.  (Def.'s Ex. 2, Corne Decl. at ¶ 19; Def.'s Ex. 10, Decl. of John

Way at ¶¶ 7-8.)  Plaintiff disputes this assertion, stating that UnitedHealth co-brands

products branded with the UNITEDHEALTHONE mark with products branded under the

name Optum.  (Pls.' Ex. 10 at UHO 002986, 006657, 045185, 046149, 046394, 047585,

019903-06; Pls.' Ex. 11 at UHO 000388, 000495.)

Michael L. Corne, a Vice President of Health Products and Regulatory Affairs at

Golden Rule Insurance Company, a subsidiary of UnitedHealth, submitted a Declaration

stating that all insurance advertisements must comply with the insurance regulating

authority in each state.  (Def.'s Ex. 2, Corne Decl. at ¶ 6.)  The state insurance

regulations require that all advertisements prominently display the name of the

UnitedHealth subsidiary that is underwriting the policy, and also require UnitedHealth

and other insurers to keep track of customer complaints.  (*Id.* at ¶¶ 6, 15.)

The individual insurance products branded under the UnitedHealthOne mark are

offered through independent brokers, broker groups, Internet brokers, and through

direct sales to consumers seeking individual insurance coverage.  Brokers who sell

UnitedHealth's individual insurance policies typically also sell products by one or more

of UnitedHealth's competitors.

Once the consumer has chosen a UnitedHealth individual insurance product, the

consumer must make a series of coverage decisions, such as the deductible amount,

co-pay amounts, coinsurance, as well as optional benefits such as vision or prescription

drug coverage.  UnitedHealth asserts that once the consumer has selected the desired

coverage, the underwriting process begins when the consumer fills out an application.

Page one of the Application Packet states the name of the underwriting insurance

company (such as Golden Rule Insurance Company).  (Def.'s Ex. 11.)  The status of the

insurance company is actually explained, however, in a paragraph at the bottom of page

one in small print.  That paragraph states, "UnitedHealthOne℠ is a brand representing a portfolio of insurance products offered to individuals and families through the UnitedHealthcare family of companies.  Golden Rule Insurance Company, a United Healthcare company, is the underwriter and administrator of these plans." (*Id.*)

Once a consumer's application has been approved, the policy is issued by the particular underwriting entity.  While UnitedHealth asserts that the underwriting entity is clearly identified as an insurance company (Def.'s Ex. 2, Corne Decl. at ¶ 8), Plaintiffs dispute this, asserting that this is Mr. Corne's subjective opinion that is unsupported by any documentary evidence.

Each applicant for coverage is underwritten and accepted or declined individually based on the information provided by the consumer as well as information obtained by UnitedHealth during the underwriting process.  This includes information found through prior claims history, such as prescription history, and through the Medical Information Bureau.  The underwriter may request that a call be made to the applicant to verify certain information or that additional medical records or lab tests are needed to make a final decision of insurability.  During this underwriting process, the consumer may be in contact with several people, such as brokers, direct sales personnel or other sales and communication specialists who would explain the scope of coverage, premium options, and guide the consumers through the process.

On average, the monthly premium for the individual insurance products marketed under the UnitedHealthOne mark is approximately $260, and holders of UnitedHealth's individual insurance policies keep their policies for approximately three years.  Since the

UnitedHealthOne mark was adopted in September of 2008, UnitedHealth's individual policies have covered, on average, 28,000 members per year in Colorado.

### HealthONE's opposition to Use of the UnitedHealthOne Mark

Before filing its intent-to-use trademark application for UNITEDHEALTHONE with the United States Patent and Trademark Office ("USPTO"), UnitedHealth knew about HealthONE, its operations, and its pre-existing and federally protected rights in the HEALTHONE® Marks.  Further, at the time HealthONE filed this lawsuit, UnitedHealth was aware of HealthONE's objections to its use of the name UNITEDHEALTHONE.

UnitedHealth's trademark registrations indicate that UnitedHealth will use the name UNITEDHEALTHONE on insurance services and managed health care services, including "health care in the nature of health maintenance organizations."  Defendant's trademark registrations do not restrict use of the UNITEDHEALTHONE name to any particular entities affiliated with UnitedHealth.

On August 14, 2008, HealthONE sent UnitedHealth a cease and desist demand letter advising it that the name UNITEDHEALTHONE would be likely to cause confusion among consumers and demanding that it stop using the name and withdraw its requests for federal registration.  UnitedHealth admits that it received this letter.  Despite HealthONE's express objections and opposition to its USPTO application, UnitedHealth did not cease and desist its attempt to register the name UNITEDHEALTHONE.

HealthONE initiated its opposition proceedings at the TTAB on September 9, 2008.  Thereafter, despite the opposition proceeding, UnitedHealth began marketing and selling products under the UNITEDHEALTHONE brand, and it continues to do so.

### Evidence Related to Customer Confusion

From September 2008 through September 2011, nearly 5,000 different holders of UnitedHealth's individual insurance policies sought treatment in one of the HealthONE-branded hospitals.  Since this dispute began, UnitedHealth has had a process in place in its call centers to identify any calls related to confusion between UnitedHealthOne and HealthONE but has not received a single report of any confusion.  (Mot. Summ. J., Ex. 2, Corne Decl. at ¶ 15.)  While HealthONE does not dispute this, it asserts that UnitedHealth did not present any evidence that it searched for evidence of confusion beyond its calls centers, such as through e-mails, website submissions, brokers or personal contact.  In reply, UnitedHealth states that it did, in fact, implement procedures for detecting such confusion and found none, and that Plaintiffs are aware of that. (Def.'s Ex. 33, Corne Dep. at 172:11-14.)

HealthONE has no evidence of any actual consumer confusion between the mark HealthONE and Optum.  HealthONE has no evidence of any actual consumer confusion between the mark HealthONE and the following entities related to Optum: AppleCare Medical Group, Memorial Healthcare IPA, Southwest Medical Associates, Lifeprint, WellMed Medical Management, and NextDoor Health.  HealthONE has no evidence of any actual consumer confusion between UnitedHealth and the following entities on which HealthONE has sought discovery related to UnitedHealth's OptumHealth business:  AppleCare Medical Group, Memorial Healthcare IPA, Southwest Medical Associates, Lifeprint, WellMed Medical Management, and NextDoor Health.  HealthONE also has conducted no surveys to determine whether any confusion

would be likely between the mark HealthONE and Optum and the following companies as to which HealthONE sought discovery related to UnitedHealth's OptumHealth business:  AppleCare Medical Group, Memorial Healthcare IPA, Southwest Medical Associates, Lifeprint, WellMed Medical Management, and NextDoor Health.

However, HealthONE did present evidence regarding confusion between HealthONE and UNITEDHEALTHONE.  While UnitedHealth objects to this evidence, I find it is admissible for purposes of the summary judgment motion.  I agree with HealthONE that the evidence it has asserted relevant to confusion is not inadmissible hearsay.  That is because the statements are not presented to prove the truth of the matter asserted, but to demonstrate the mental state of the persons making them. Accordingly, they fall within the exception to hearsay found in Fed. R. Evid. 803(3).  *See Univ. of Kansas v. Sinks,* 565 F. Supp. 2d 1216, 1230-31 (D. Kan. 2008).  To the extent UnitedHealth attacks the credibility of the witnesses, arguing that the Court should disregard their testimony as they were HealthONE employees who did not keep written documentation of the conversations and/or cannot recall the specific name of a caller or person allegedly confused, I find for purposes of the summary judgment motion that this goes to the weight of testimony rather than its admissibility.  *See id.* at 1230 n.19.[2]  I now turn to HealthONE's evidence of confusion.

According to an interrogatory response by HealthONE, in December 2009, the CEO of HealthONE's Rose Medical Center, Kenneth Feiler, received several phone

---

[2]  I also find no evidence of bad faith in connection with the destruction or loss of evidence regarding confusion.  At most, the failure to retain the evidence appears to be mere negligence.

calls from a former patient who was unhappy with HealthONE sending

UNITEDHEALTHONE insurance solicitations to patients.  The former patient sent

Mr. Feiler a copy of the solicitation, which was a piece of direct mail from

UNITEDHEALTHONE.  (Pls.' Ex. 41, HealthONE's First Supplemental Resp. to

UnitedHealth's First Set of Interrogatories at Resp. No. 8; *see also* Def.'s Ex. 29,

Kenneth Feiler Dep. ["Feiler Dep."]  at 74:16-23, 79:6-11, 80:20-25 – first time Mr. Feiler

heard or obtained knowledge of UnitedHealthOne mark was when he received a patient

complaint from a woman who was furious and claimed that he had given away her

health insurance information and wanted to change her insurance; she faxed him the

paper that had UnitedHealthOne on it.)  In reply, UnitedHealth points out that the caller

was upset that her personal information had been given to another company, which

indicates that the caller was making a distinction between the two companies.

Mr. Feiler was unfamiliar with UNITEDHEALTHONE and was confused as to

whether the paper sent to him by this caller with the name UnitedHealthOne was a

HealthONE product.  (Pls.' Ex. 41, Resp. No. 8; Def.'s Ex. 29).  Indeed, Mr. Feiler

thought that "when she sent the paper to me, I really thought it was ours. I thought it

was HealthONE."  (Def.'s Ex. 29, Feiler Dep. at 82:19-21.)  He believed that HealthONE

had begun selling health insurance policies.  (Pls.' Ex. 42, Feiler Dep. at 84:5-21.)

Mr. Feiler called Leonard Kalm, the Senior Vice President for Managed Care at

HealthONE, who informed him that UnitedHealthOne was not a HealthONE product.

(Pls. Ex. 41, Resp. No. 8; Def.'s Ex. 29, Feiler Dep. at 82:11-12.)

In June 2009, a representative of SunTrust Bank, located in North Carolina, called HealthONE on behalf of a SunTrust Bank customer for the purpose of having HealthONE assist in the cancellation of the customer's UNITEDHEALTHONE insurance policy.  (Pls.' Ex. 41, HealthONE's First Supplemental Resp. to UnitedHealth's First Set of Interrogatories at Resp. No. 8; Pls.' Ex. 43, Dep. of Meaghan Scull ["Scull Dep."] at 35:2-36:23, 52:5-24, 53:9-13.)  Ms. Scull, a receptionist at HealthONE at that time, answered this telephone call and testified that this person seemed confused that the number was not for UnitedHealthOne and confused about where he was calling.  (Scull Dep. at 41:15-23, 44:22-45:4, 53:19-54:1.)  She explained to the caller that HealthONE owned and operated hospitals and that UnitedHealth was an insurance company.  (*Id.* 54:2-5.)  She also told him that if he had an insurance question about United Healthcare or was trying to reach some insurance company with the name United, he would have to call United Healthcare.  (*Id.* at 45:6-9.)

Prior to that phone call, Ms. Scull had received two separate phone calls from other individuals who had contacted HealthONE in their attempts to reach UNITEDHEALTHONE.  The individuals asked her "Is this UNITEDHEALTHONE?" (Scull Dep.  at 30:17-34:20.)  As a result of these calls, Ms. Scull contacted her supervisor Mr. Snowe who asked her to contact HealthOne's general counsel about this.  (*Id.* at 45:19-46:6.)

On May 13, 2010, Ian Barber noticed a television advertisement for UNITEDHEALTHONE while he was at home near Denver, Colorado.  He called his wife, Davia Barber, a HealthONE employee, to ask her whether UnitedHealth had acquired or

merged with her employer, HealthONE.  (Pls.' Ex. 41, HealthONE's First Supplemental

Resp. to UnitedHealth's First Set of Interrogatories at Resp. 8; Pls.' Ex. 44 at HONE

000013-41; Pls.' Ex. 45, Dep. of Ian Barber at 11:9-13:10, Pls.' Ex. 46, Dep. of Davia

Barber [Mrs. Barber Dep."] at 20:12-22, 21:6-21.)

      Davia Barber is a managed care consultant for HealthONE, supporting

HealthONE to enable it to provide medical services to patients.  (Pls.' Ex. 46,

Mrs. Barber Dep. at 12:-9-12.)  She negotiates managed care contracts with insurance

payers in Colorado, Oklahoma, Kansas, and Nevada.  (*Id.* 12:18-23.)  Ms. Barber

previously worked for UnitedHealth and is familiar with the business of the two

companies.  (*Id.* 11:12-12:22; 13:8-14:12.)  On May 13, 2010, Mrs. Barber verified in her

deposition that she received a telephone call from Mr. Barber asking whether

UnitedHealth acquired or merged with HealthONE.  (*Id.* at 20:12-21:21, 22:21-24:3.)

Mrs. Barber testified that she told her husband that she had not heard that UnitedHealth

had purchased HealthONE and would find out what she could about the issue.  (*Id.* at

22:21-25.)[3]

      Mrs. Barber testified that  she then contacted her supervisor, Will Smitham,

informing him that she had received a phone call from her husband advising that he had

seen a commercial whereby he thought HealthONE had been purchased by

UnitedHealth.  (Pls.' Ex. 46 at 23:1-16.)  Mr. Smith assured Mrs. Barber that

UnitedHealth had not purchased HealthONE.  (*Id.* at 23:17-20.)  According to

---

[3]  This differs from what Mr. Barber recalled, who testified that Mrs. Barber told him that nothing was going on between the two companies.  (Pls.' Ex. 45, Dep. of Ian Barber at 15:11:22.)

HealthONE's Interrogatory response, Mrs. Smitham requested that Mrs. Barber compose an e-mail regarding UNITEDHEALTHONE, which was subsequently forwarded to other HealthONE personnel.  (Ex. 41, HealthONE's First Supplemental Resp. to UnitedHealth's First Set of Interrogatories at Resp. 8.)

A supplemental interrogatory response of HealthONE states that its broadcast media monitoring vendor, Cision, regularly sends broadcast media clips pertaining to HealthONE to the marketing department at HealthONE for a fee.  In 2009, Cision sent HealthONE a report with a broadcast media clip regarding UNITEDHEALTHONE because Cision incorrectly believed that UNITEDHEALTHONE and HealthONE were affiliated.  (Ex. 41, HealthONE's First Supplemental Resp. to UnitedHealth's First Set of Interrogatories at Resp. 8.)  HealthONE contacted Cision to inform them of the mistake. HealthONE explained that Cision should not include clips about UNITEDHEALTHONE in future reports because HealthONE is not affiliated with UNITEDHEALTHONE.  (*Id.*)

Also, on March 3, 2010, the Denver Post published an article regarding medical insurance prices that referred twice to UnitedHealthONE as an insurance carrier in the Colorado market.  (Ex. 41, HealthONE's First Supplemental Resp. to UnitedHealth's First Set of Interrogatories at Resp. 8.)

While in the physicians' lounge at HealthONE's Sky Ridge Medical Center, a HealthONE physician asked Ms. Tarrant, the CEO of HealthONE's Sky Ridge Medical Center, whether she was aware if HealthONE was part of a new program affiliated with UnitedHealth.  (Pls.' Ex. 47, Tarrant Dep. at 8:23-25, 59:12-17.)  She advised him that she had not heard of any such program.  (*Id.* 59:21-22.)  She also heard around that the

same time that an employee or two had asked about this issue.  (*Id.* 62:5-7.)  They wanted to know what the story was between UnitedHealth and HealthONE because they saw the two names together.  (*Id.* at 69:11-72:12.)

Ms. Tarrant testified that she contacted HealthONE's corporate office to find out if there was some program that had been initiated between the two companies, reporting that she had heard this from several people.  (Pls.' Ex. 47, Tarrant Dep. at 62:7-22, 63:25-64:8.)  She was informed by corporate that the two companies were not working on any programs together and that corporate was trying to resolve how the issue had come up.  (*Id.* at 64:11-18.)  She then conveyed this information to the people in her organization.  (*Id.*, 67:5-16.)  Ms. Tarrant came to understand through her interactions with corporate that the name "UnitedHealthOne" was being used by UnitedHealth to market some insurance products.  (*Id.* at 64:19-65:7.)

**Alleged Use of Plaintiffs' Marks by Third Parties**

HealthOne, Inc. of Knoxville, Tennessee, was founded in 1994 and provides physician billing and management services.  While Plaintiffs admit this, they assert that approximately 95% of the business of HealthOne, Inc. of Knoxville, Tennessee is the provision of billing services.  The company's provision of physician management services is only 5 percent of its business.  Additionally, it has only a single office located in Tennessee.  (Pls.' Ex. 13, Dep. of David C. Purvis at 16:3-8.)

In 2000, HealthOne, Inc. of Knoxville, Tennessee received a demand letter from Plaintiffs.  After an exchange of letters with no further action from Plaintiffs, that company's CEO understood there to be a "peaceful coexistence" with Plaintiffs.  While

Plaintiffs admit this, they assert that HealthOne, Inc. of Knoxville, Tennessee has never applied for federal registration, that they continue to monitor this company, and that the "peaceful coexistence" between the companies referenced by Defendant was based on the company's use of the HealthONE mark only for billing services and only in that geographic area.

The domain name <www.healthone.com> is not owned by HealthONE but rather by the unrelated company of HealthONE of Knoxville, Tennessee, which has used that website to advertise its healthcare billing and management services since registering the domain name sometime prior to 2000. While Plaintiffs admit this, they assert that the company's advertising is limited primarily to Tennessee and the surrounding areas.

Health One, Inc., of Ridgeland, Mississippi, was founded in 1995 and provides health care claims priority consultant services. That company advertises its services through a website at <health-one.net>. Plaintiffs admit this, but assert that the services of that company include assisting with insurance claims and assignments of benefits to ensure health care providers are paid by insurance companies. (Pls.' Ex. 15, Dep. of Marcus Thompson ["Thompson Dep."] at 23:3-15.) The company's clients are limited to Mississippi, Louisiana, and Ohio. (*Id.* at 84:12-85:15.) Plaintiffs further assert that HealthOne, Inc. of Ridgeland, Mississippi has never applied for federal registration of its name, and that they continue to monitor the use of the HealthONE mark by this company. (Resp., Ex. 14, Kanamine Aff. ¶ 8.)

HealthOne, Inc. of Ridgeland, Mississippi approached a representative of HealthONE, Jacob Weismann, at a conference in October 2009, and Mr. Weismann

noted that both companies use the HealthOne name.  Mr. Thompson, a corporate

representative of the Mississippi company, testified in his deposition that he called

Mr. Weismann to discuss doing business.  (Pls. Ex. 15, Thompson Dep. at 82:9-83:15.)

While Plaintiffs denied that the two discussed doing business, citing the deposition

testimony of Mr. Weismann, the deposition does not support this denial.  Instead, when

asked whether Mr. Thompson followed up with him to see if he could do business with

him, Mr. Weismann admitted that he received some phone calls from Mr. Thompson but

said he did not actually do business with him.  (Pls.' Ex. 16, Dep. of Jacob Weismann at

10:24-11:6.)

Health One Inc., of Falls Church, Virginia, was founded in 1995 and provides

workaday health screening services and laboratory services in Atlanta, Chicago,

Philadelphia, Pasadena, Irvine, Dallas, and Richmond.  It previously operated a clinic in

Alexandria, Virginia offering physicals, exams, and medical testing.  Health One Inc of

Virginia advertises its services through websites at <healthoneinc.com> and

<healthonelabs.com>.  While Plaintiffs admit this, they assert that the workaday health

screening services are primarily limited to the metro Washington D.C. area, and that the

service provided in the other cities were mostly for long-standing or regular clients.

(Pls.' Ex. 17, Dep. of Robert M. Quave ["Quave Dep."] at 24:11-21, 43:14-44:3.)

Additionally, Plaintiffs assert that the company ceased providing services at its

Alexandria, Virginia clinic sometime between 2003 and 2005.  (*Id.* at 23:1-24:10, 44:4-

15.)  Further, Health One Inc., of Falls Church, Virginia, has never applied for federal

registration of its name (*id.* at 59:11-22), and HealthONE continues to monitor the use of

the HealthONE mark by this company. (Resp., Ex. 14, Kanamine Aff. ¶ 9.) Finally, Plaintiffs assert that other than its website, the company's advertising is limited to maintaining a company Facebook page and more recently, Google advertisements. (Pls.' Ex. 17, Quave Dep. at 34:16 to 35:1, 40:16 to 41:4.)

Health One Medical Centers, of Detroit, Michigan, was founded in 1996 and provides medical clinic services in Lincoln Park and Dearborn Heights, Michigan. (Pls. Ex. 18, Dep. of Charmaine Goonewardena ["Goonewardena Dep."] at 14:15-15:6.) It has previously operated as many as four clinics. (*Id.* 27:24-28:8.) The company provides its services through a website at <healthonemedicalcenters.com>. Plaintiffs admit this, but assert that all of the clinics of Health One Medical Centers are located in the Detroit area. (Pls. Ex. 18, Goonewardena Dep. at 14:15-15:6, 27:24-28:8.) They further assert that the company has never applied for federal registration of its name (*id.* at 36:18-37:7), and that HealthONE continues to monitor the company's use of the HealthONE mark. (Pls.' Ex. 16, Kanamine Aff. ¶ 10). Finally, Plaintiffs assert that other than the website, the company's advertising is limited to an ad in the local Yellow pages. (Pls.' Ex. 18, Goonewardena Depo. at 26:7-10.)

HealthOne Staffing of Rocklin, California, was founded in 2003 and provides nurse staffing services to, among other hospitals, hospitals owned by HealthONE. The company advertises its services through a website at <healthonestaffing.com>. Plaintiffs assert that HealthOne Staffing has agreed to voluntarily discontinue using the name HealthONE and to change its name in response to HealthONE's objection. (Pls.' Ex. 19 at HONE 017819.)

HealthONE Alliance, of Calhoun, Georgia, was founded in 1994 and serves approximately 73,900 members.  The company advertises its services through a website at <healthonealliance.com>.  The company provides "a network to self-insured employers of hospitals, physicians, ancillary services, as well as . . . [a] network for [its] insured plan."  (Pls.' Ex. 20, Dep. of Judy Fair ["Fair Dep."] at 11:24-12:4.)  It also has developed an EMR software, basically for local physicians.  (*Id.* at 12:5-7.)  It provides services in Georgia, and has three offices there, but its programmers for the technologies group are in Texas.  (*Id.* at 15:6-14.)  Plaintiffs point out that the company's network and services are limited to Georgia and parts of Tennessee.  Plaintiffs further point out that the company has never applied for federal registration of its name (Pls.' Ex. 20, Fair Dep. at 28:13-16, 46:20-47:1), and that they continue to monitor its use of the HealthONE mark.  (Pls.' Ex. 14, Kanamine Aff. ¶ 11.)

Health and Nutrition Technology, of Capitola, California, was founded in 1994 and provides a Health One weight loss product.  The company owns and operates a clinic in Durango, Colorado that is overseen by two local physicians.  It markets its goods and services through a website at <myhealthone.com>.  HealthONE asserts that it continues to monitor the use of the HealthOne mark by this company.  (Pls.' Ex. 14, Kanamine Aff. ¶ 12.)  It further asserts that other than the website, Health and Nutrition Technology's advertising is limited to occasional ads in local newspapers or radio stations where its offices are located and the occasional attendance by staff at trade shows.  (Pls.' Ex. 21, Dep. of Hannah Pacey Schultz Wilson at 24:8-18.)

III.     ANALYSIS

    A.     Summary of Argument

UnitedHealth argues that HealthONE's claim of trademark infringement—which also underlies all of its other causes of action—fails as a matter of law because HealthONE cannot show likely consumer confusion.  Defendant asserts on that issue that the parties' respective experts both found legally insufficient levels of likely confusion.  Further, it asserts that there is no evidence that any legally significant number of actual consumers have ever been confused by the use of these two brands. UnitedHealth claims that this not surprising, as the respective marks look different, sound different, have different meanings, and are used to market different products through different marketing channels.  UnitedHealth also argues that there is no evidence anywhere in the record that a brand used by a local hospital chain in Denver played any role in the decision by one of the world's largest insurers to choose a new nationwide brand consisting of its own name plus the industry-recognized standard for identifying companies selling individual health insurance – "One."

HealthONE argue in response that its survey expert found more than legally sufficient levels of likely confusion and that the survey by UnitedHealth's expert, when corrected for its gross misinterpretation of responses, also found more than legally sufficient levels of confusion.  Further, it asserts that there exist numerous instances of actual confusion by UnitedHealth's use of the words "healthone", which is not surprising as UnitedHealth knowingly appropriated the HEALTHONE® Mark in its entirety. HealthOne also contends that the marks look and sound the same, convey the same

meaning and are used to market increasingly similar products and services through precisely the same marketing channels.  It is argued by HealthONE that these significant disputes of material fact preclude summary adjudication of its claims.

B.     Standard of Review

Summary judgment may be granted where "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and the ... moving party is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c).  "A fact is 'material' if, under the governing law, it could have an effect on the outcome of the lawsuit."  *E.E.O.C. v. Horizon/ CMS Healthcare Corp.*, 220 F.3d 1184, 1190 (10th Cir. 2000).  "A dispute over a material fact is 'genuine' if a rational jury could find in favor of the nonmoving party on the evidence presented."  *Id.*

The burden of showing that no genuine issue of material fact exists is borne by the moving party.  *Horizon/ CMS Healthcare Corp.*, 220 F.3d at 1190.  "'Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment.'"  *Atl. Richfield Co. v. Farm Credit Bank of Wichita*, 226 F.3d 1138, 1148 (10th Cir. 2000) (quotation omitted).  The court must "'view the evidence and draw all reasonable inferences therefrom in the light most favorable to the party opposing summary judgment.'"  *Id.* (quotation omitted).  All doubts must be resolved in favor of the existence of triable issues of fact.  *Boren v. Sw. Bell Tel. Co.*, 933 F.2d 891, 892 (10th Cir. 1991).

In order to avoid summary judgment on a trademark infringement claim, a plaintiff "must show that a genuine issue of material facts exists regarding whether defendants' use of its [trademark] would likely cause confusion . . . ." *King of the Mountain Sports, Inc. v. Chrysler Corp.*, 185 F.3d 1084, 1089 (10th Cir. 1999).  Although likelihood of confusion "'is frequently a fairly disputed issue of fact on which reasonable minds may differ, the issue is amenable to summary judgment in appropriate cases.'" *Id.* (quoting *Universal Money Ctrs. Inc. v. Am. Tel. & Tel. Co.*, 22 F.3d 1527, 1530 n. 2 (10th Cir. 1994)).

C.      Whether Summary Judgment is Appropriate on the Trademark Claim and Claims Requiring a Showing of Likelihood of Confusion

Count I of HealthONE's Verified Complaint asserts that UnitedHealth's use of the UnitedHealthOne mark without HealthONE's permission constitutes trademark infringement in violation of the Lanham Act, 15 U.S.C. § 1114(1).  "'A trademark is a distinctive mark, symbol, or emblem used by a producer or manufacturer to identify and distinguish his goods from those of others.'" *Beer Nuts, Inc. v. Clover Club Foods, Inc.*, 711 F.2d 934, 939 (10th Cir. 1983) ["*Beer Nuts I*"] (quotation omitted).  To prove infringement, HealthOne must prove, among other elements, that UnitedHealth's use is likely to cause confusion in the marketplace concerning the source or quality of the products. *Universal Money Ctrs.*, 22 F.3d at 1530.

Several factors are relevant in determining whether there is a likelihood of confusion:  (i) the degree of similarity between the marks, including the mark's appearance, pronunciation, suggestion, and manner of display; (ii) strength or

weakness of the plaintiff's mark; (iii) the intent of the alleged infringer in adopting its mark; (iv) similarities and differences of the parties' goods, services, and marketing strategies (also stated as the relation in use and the manner of marketing between the goods and services marketed by the competing parties); (v) the degree of care likely to be exercised by purchasers of the goods or services involved; and (vi) evidence of actual confusion. *Heartsprings, Inc. v. Heartspring, Inc.*, 143 F.3d 550, 554 (10th Cir. 1998).  This list is not exhaustive. *King of the Mountain*, 185 F.3d at 1090.

"Some of these factors may prove more relevant than others, depending on the facts of each case"; and other cases may demand consideration of other factors. *Heartsprings*, 143 F.3d at 554.  "No one factor is dispositive, and the final determination of likelihood of confusion must be based on consideration of all relevant factors. *Id.*  "In every case, however, the key inquiry is whether the consumer is likely to be deceived or confused by the similarity of the marks." *Id.*

### 1.  First Factor - Degree of Similarity

As to the first factor, the degree of similarity between the marks, the marks must be compared in the light of what occurs in the marketplace where the prospective purchaser does not ordinarily carry a sample of the mark. *Hartford House, Ltd. v. Hallmark Cards, Inc.*, 846 F.2d 1268, 1370 (10th Cir. 1988).  The degree of similarity of the mark is tested on three levels as encountered in the marketplace:  sight, sound, and meaning. *Universal Money Ctrs.*, 22 F.3d at 1530-31.  The similarities of the marks are given more weight than the differences. *King of the Mountain*, 185 F.3d at 1090.

"The court may not engage in a side-by-side comparison of the marks. *King of the Mountain*, 185 F.3d at 1090. "Rather, 'the court must determine whether the alleged infringing mark will be confusing to the public when singly presented.'" *Id.* (quoting *Universal Money Ctrs.*, 22 F.3d at 1531); *see also Sally Beauty Co., Inc. v. Beautyco, Inc.,* 304 F.3d 964, 972 (10th Cir. 2002). The court is "not free to focus solely on name similarity." *Id.* at 555. Similarity of appearance is determined "on the basis of the total of the designation, rather than on a comparison of individual features." *First Sav. Bank, F.S.B. v. FirstBank Sys.*, 101 F.3d 645, 653 (10th Cir. 1996). "[T]he likelihood of confusion is reduced if the two trademarks, taken as a whole, are visually distinct." *Heartsprings, Inc.*, 143 F.3d at 554. This factor has been held to be the most important factor. *See King of the Mountain*, 185 F.3d at 1091.

I first address similarity in sound, finding that this weighs against a finding of similarity. While UnitedHealth's logo marks employ, in part, the same phrase as HealthOne's mark and therefore might sound somewhat similar, *King of the Mountain*, 185 F.3d at 1091, I find overall find that the presence of the additional word "United" at the beginning of the UnitedHealthOne mark weighs against a finding of similarity under the "sound" factor. *See Lederman Bonding Co. v. Sweetalia*, No. 06-cv-00950-WYD-BNB, 2006 WL 2949290, at 4 (D. Colo. Oct. 16, 2006); *see also First Sav. Bank*, 101 F.3d at 653. This makes the two marks different in pronunciation, particularly since the word "United" is at the beginning of the mark. Further, Defendant's mark contains five syllables as compared to Plaintiffs' mark containing only two syllables. Thus, I find that the marks are dissimilar in sound.

I now turn to similarity in sight.  HealthONE's stylized marks appear as follows:

 

UnitedHealth's stylized marks appear as follows:

 

I find that the appearance of the marks is dissimilar, even when the marks are "singly presented."  Although the marks use the word "healthone" in some format, significant differences exist visually in the overall design of the stylized marks. HealthONE's marks appear only in the color black and with a banner or cursive writing. UnitedHealth's marks, on the other hand, use both black and blue, have different fonts, and attach UnitedHealth's stylized logo.  I also note that HealthONE's mark consists of two word segments, "Health" and "ONE", while the UnitedHealthOne mark has three. And HealthONE's stylized mark, as it appears in the marketplace, capitalizes the word "ONE" whereas UnitedHealth's does not.  Further, HealthONE argued successfully in other litigation before the TTAB that "it is often the first part of a mark that is most likely to be impressed upon the mind of a purchaser and remembered"  *See HCA-Healthone LLC v. Marel Norwood*, TTAB Opp. Proc. 91182226, June 3, 2011 Opinion, Def.'s Ex. 22 at 9-10.

Nonetheless, I find that the similarities between HealthONE's marks and UnitedHealth's marks outweigh the differences.  As HealthONE points out, it has registered "standard character" marks.  Such registrations make no claim to any

particular font style, color, or size of display and, thus, are not limited to any particular

presentation. *Sally Beauty*, 304 F.3d at 970 (citing 4 J. Thomas McCarthy, McCarthy on

Trademarks and Unfair Competition § 19:58 (4th ed. 2011)) [hereinafter "McCarthy"].

Based on the foregoing, HealthONE asserts rights in the "HealthONE" mark, regardless

of type styles, proportions or other possible variations. *Id.* "[T]he argument concerning

a difference in type style is not viable where one party asserts rights in no particular

display." *SquirtCo v. Tomy Corp.*, 697 F.2d 1038, 1041 (Fed. Cir. 1983). The cases

relied on by UnitedHealth, including *First Savings Bank* and *King of the Mountain*, did

not involve standard character marks such as at issue here.

I also note that Defendant's marks are not actually three separate words, but a

combined word using the term "HealthOne". UnitedHealth argues, however, that this

similarity is not enough to outweigh the visual differences in the marks, citing *Sally*

*Beauty Co.*, 304 F.3d at 972 (finding that the marks were not visually similar because

they contained different numbers of words, and although they both began with the same

six letters, this mere similarity was not sufficient to outweigh their visual differences). I

disagree. UnitedHealth ignores the fact "that the dominant portion of each mark is

entitled to greater weight in evaluating the likelihood of confusion." *Universal Money*

*Ctrs.*, 22 F.3d at 1531. In this case, construing the evidence in the light most favorable

to HealthONE, I find that "healthone" as used in the marks is the dominant portion, to

which UnitedHealth simply added "United."

UnitedHealth argues, however, that it has done nothing more than add the word

"one" to its own well-known name of UnitedHealth. It asserts that the word "one" has

been recognized by TTAB to be a "weak" element in the health insurance field, such that "purchasers are able to distinguish among various ONE marks by looking at other elements of the marks", citing *Humana Inc. v. Aetna Inc.*, TTAB Opp. Proc. 91192704, Oct. 13, 2010 Opinion, attached as Def.'s Ex. 23, at 17-18.  I reject this argument for purposes of summary judgment.

First, there is conflicting evidence about whether Defendant actually is known by the public as "UnitedHealth" as compared to "United" or some other name.  Second, even if I assume that it is known by "UnitedHealth" and that it just added the word "one" to its name, I still find that is not sufficient to overcome the similarities in the marks. Construing the evidence in the light most favorable to HealthONE, from the consumer's perspective it could reasonably appear that Defendant simply added its name "United" to the HEALTHONE mark.  McCarthy noted that "[a] junior user [as Defendants are here] cannot justify [their] confusing use of another's mark simply by taking on its own house mark or tradename.  Such a usage may merely suggest to customers that a plaintiff has licensed defendant or that they are affiliated in some other way."  McCarthy § 23:43; *see also Big O Tires, Inc. v. Bigfoot 4X4, Inc.*, 167 F. Supp. 2d 1216, 1223 (D. Colo. 2001).

This was also noted by the TTAB in the *HumanaOne* decision relied on by UnitedHealth.  *See* Def.'s Ex. 23.  The TTAB stated in that case that it "has frequently held that a mere addition of a house mark to a registered mark will not avoid confusion." *Id.* at 17.  Comparing the AetnaOne and HumanaOne mark, the TTAB stated that this was not a case where Aetna "has merely added its house mark to opposer's registered

mark." *Id.*  In other words, AETNA was not added to HUMANAONE to form the mark

AETNA HUMANAONE.  *Id.*  Here, however, a reasonable consumer could assume that

this is such a case, *i.e.,* that Defendant as a junior user simply added its name to

HEALTHONE's trademark to form the name UNITEDHEALTHONE.

Further, numerous courts and the TTAB have found marks adding just one word

to another's mark to be "sufficiently similar to sustain a finding of likelihood of

confusion."  *In re Charter One Fin., Inc.*, 2003 WL 22273112, *3 (T.T.A.B. 2003) ("[T]he

addition of the word "ONE" plainly does not so change [the] applicant's mark in any

significant respect as to avoid a likelihood of confusion."); *accord Coherent, Inc. v.*

*Coherent Techs., Inc.*, 736 F. Supp. 1055, 1064 (D. Colo. 1990) (defendant's addition of

one word to plaintiff's mark found to be visually similar); *SuperShuttle Int'l, Inc. v.*

*Schaefer-Schonewill & Assocs., Inc.,* No. 95-D-2272, 1996 WL 575940, *2 (D. Colo.

Feb. 26, 1996) (same); *Road Dawgs Motorcycle Club of the U.S., Inc. v. Cuse Road*

*Dawgs, Inc.*, 679 F. Supp. 2d 259, 286-87 (N.D.N.Y. 2009) (same).  Further, courts

have "repeatedly held" that the confusion created by using the same word as a primary

element in a trademark cannot be counteracted by simply adding another word.  *Marker*

*Int'l v. deBruler*, 635 F. Supp. 986, 999 (D. Utah 1986), *aff'd*, 844 F.2d 763 (10th Cir.

1988) (quotation omitted); *see also Miss Universe, Inc. v. Patricelli*, 408 F.2d 506, 509-

10 (2d Cir. 1969); *Cont'l Connector Corp. v. Cont'l Specialties Corp.*, 492 F. Supp.

1088, 1095 (D. Conn. 1979); *Trak Inc. v. Benner Ski KG*, 475 F. Supp. 1076, 1082

(D. Mass. 1979).

I now turn to whether there is a similarity in meaning.  UnitedHealth argues that the use of the suffix "one" is recognized in the industry as identifying companies that sell individual insurance policies.  It is used not only by UnitedHealth but by several of its major competitors, including the marks HumanaOne and CoventryOne.  Thus, the UnitedHealthOne mark is intended to convey the meaning of an individual insurance policy, as opposed to a group policy.  Because HealthONE does not offer insurance products, UnitedHealth argues that its marks cannot possibly convey that same meaning.  I disagree.

The relevant inquiry is not how the mark is understood by any particular industry, but how it is perceived by the consumer in the marketplace, and whether it is likely to cause confusion or mistake, or to deceive purchasers or users as to the source, endorsement, affiliation or sponsorship of the product or services.  *Amoco Oil Co. v. Rainbow Snow*, 748 F.2d 556, 559 (10th Cir. 1984).  While UnitedHealth frames the inquiry as limited to the word "one", the shared words are "healthone", which could give a reasonable consumer an impression of primacy, of being first place, or high quality, in the health care field.  This is particularly significant, because UnitedHealth has, through its subsidiaries, advanced into the direct provision of medical care where it competes directly with HealthONE.

Further, construing the evidence in the light most favorable to Plaintiffs, UnitedHealth's advertisements and website blur the line between health insurance and health care, and could reasonably give consumers the impression that UnitedHealth provides health care services.  Thus, I find that the marks for "HEALTHONE" AND

"UNITEDHEALTHONE" could convey to a reasonable consumer the same idea and/or stimulate the same mental reaction regarding health care.  *See Universal Money Ctrs.*, 22 F.3d at 1531.  As noted in the TTAB case relied on by UnitedHealth, "[d]espite an arguable difference in meaning, we find that when considering the respective marks in their entireties, they create a similar commercial impression."  *HCA-Healthone LLC v. Marel Norwood*, Def.'s Ex. 22 at 10; *see also SquirtCo*, 697 F.2d at 1041.  "If there were any doubts about this conclusion, it would, of course, have to be resolved in favor of the prior user. . . ."  *SquirtCo*, 697 F.2d at 1041

I find from the foregoing that a reasonable juror could conclude that the HealthONE and UnitedHealthOne marks are confusingly similar.  This factor thus weighs in favor of finding a likelihood of confusion and against UnitedHealth.

### 2.   Second Factor - Strength or Weakness of Plaintiffs' Mark

As to the strength of the mark, "[t]he stronger the mark, the more likely it is that encroachment on it will produce confusion."  *First Savings Bank*, 101 F.3d at 653.  "To address the relative strength of a mark, one must consider the two aspects of strength: (1) 'Conceptual Strength: the placement of the mark on the [distinctiveness or fanciful-suggestive-descriptive spectrum;' and (2) 'Commercial Strength: the marketplace recognition value of the mark.'"  *King of the Mountain*, 185 F.3d at 1093 (quoting McCarthy § 11:83).  Conceptual strength is the placement on the distinctiveness spectrum, which categorizes trademarks in the following ascending order of relative strength: generic, descriptive, suggestive, arbitrary, or fanciful.  *Heartsprings*, 143 F.3d at 555.

UnitedHealth argues that HealthONE's marks, composed merely of the words "health" and "one," fall squarely within the definition of "descriptive" and, as such, are not very strong.  HealthONE does not dispute that, but argues in response that continuous use of a registered mark for five years after registration makes the mark incontestable and not vulnerable to the defense of descriptiveness, citing 15 U.S.C. § 1065 and *Park 'N Fly, Inc. v. Dollar Park & Fly, Inc.*, 469 U.S. 189, 197 (1985).  Eight of the HEALTHONE® Marks are federally registered and four of them have been in continuous use for more than five years post-registration.  Thus, HealthONE asserts that those four marks are incontestable and cannot be found to be conceptually weak as a matter of law.  I reject that argument.

The Supreme Court in *Park 'N Fly* held that an infringement action brought by the holder of an incontestable mark may not be defended on the ground that the mark is merely descriptive and therefore invalid.  *Id.* at 667; *see also Oreck Corp. v. U.S. Floor Sys., Inc.*, 803 F.2d 166, 171 (5th Cir. 1986).  Defendant's argument is not that HealthONE's marks are invalid; it is that the marks were not infringed because there is not a likelihood of confusion.  *Oreck Corp.*, 802 F.2d at 171.  The Supreme Court's holding in *Park 'N Fly* did not address likelihood of confusion.  *Munters Corp. v. Matsui America, Inc.*, 900 F.2d 250, 252 (7th Cir. 1990).  Therefore, it does not preclude consideration of a mark's strength for purposes of determining this issue, even as to incontestable marks.  *Id.*  As noted by the Fifth Circuit, "[i]ncontestable status does not make a weak mark strong."  *Id.*  It does, however, serve to enhance its strength to some

degree.  *Frehling Enter., Inc. v. Intern. Select Group, Inc.*, 192 F.3d 1330, 1336 (11th

Cir. 1999).

On the other hand, I agree with UnitedHealth that the term "healthone" appears

to fit within the definition of "descriptive", since it describes a characteristic of the service

it provides, *i.e.*, health services.  *See Heartsprings*, 143 F.3d at 555 ("'A descriptive term

describes a characteristic of a product or service.'")  "A descriptive mark is conceptually

weak.  *See, e.g.*, *Davis v. Walt Disney Co.*, 430 F.3d 901, 903 (8th Cir. 2005);

*Checkpoint Systems, Inc. v. Check Point Software*, 269 F.3d 270, 283 n. 10 (3rd Cir.

2001).  I find from the foregoing as to conceptual strength that even though some of

HealthONE's marks are incontestable, the marks are weak.

Nonetheless, an inherently weak mark "'may be strengthened by such factors as

extensive advertising, length of exclusive use, public recognition. . . .'"  *Entrepreneur*

*Media, Inc. v. Smith*, 279 F.3d 1135, 1144 (9th Cir. 2002) (quotation omitted).  Thus, I

turn to the commercial strength of HealthONE's mark.  "The commercial strength prong

measures the marketplace recognition value of the mark."  *Big O Tires*, 167 F. Supp. 2d

at 1227.  A strong mark is "one that is rarely used by parties other than the owner of the

trademark, while a weak trademark is one that is often used by other parties."  *First Sav.*

*Bank*, 101 F.3d at 653.  "The greater the number of identical or more or less similar

marks already in use on different kinds of goods, the less is the likelihood of confusion

between any two specific uses of the weak mark."  *Id.* at 653-54.

UnitedHealth argues that the commercial strength of HealthONE's mark is weak

because the undisputed evidence shows that variants of HealthONE's marks are widely

used in the "health" industry, as HealthONE itself seeks to so broadly define it.  In fact,

HealthONE does not even own rights to the "healthone.com" web address.  That

website name is, instead, owned by a medical billing service.  UnitedHealth argues that

this evidence of extensive use of the HealthONE mark in the health industry

demonstrates that Plaintiffs' marks are entitled to little or no protection, citing *First Sav.*

*Bank*, 101 F.3d at 654 (recognizing "the well-established principle that extensive third-

party use of the disputed term indicates that the term itself deserves only weak

protection") and *Universal Money Ctrs.*, 22 F.3d at 1533–34 (finding that the mark at

issue in the case was relatively weak based on the use of the term by a significant

number of entities).

I agree that the evidence of extensive use of the term "healthone" in the health

industry weighs against a finding of commercial strength in the marketplace.  However,

HealthONE has presented evidence that it vigorously polices its marks and that it has

sought to prohibit use of "healthone" marks on products or services similar to

HealthONE's through the TTAB or other action.  Further, the evidence presented by

UnitedHealth of third party users of the words "health" and "one" shows that they do not

market or provide services to HealthONE's consumers.  The identified third parties use

their names in limited geographic areas outside of HealthONE's primary service areas

and do little, if any, paid advertising outside of owning their company websites.

Further, many of the third parties use the term "healthone" on products or

services different from HealthONE, such billing services or a weight loss product.  As

noted by one court, "the relevant inquiry in evaluating the commercial strength or

weakness of [a mark] is not the extent to which *any* other third parties may be using similar marks, but whether they are using similar marks 'on similar goods.'" *Big Dog Motorcycles, L.L.C. v. Big Dog Holdings, Inc.*, 402 F. Supp. 2d 1312, 1337 (D. Kan. 2005).  "This is because the evidentiary impact of such third party marks turns upon the probable impact of the use of those marks on the minds of the target group of consumers."  *Id*.  I find that these factors weigh in favor of a finding that HealthONE's mark is commercially strong, and overcome UnitedHealth's argument to the contrary.

I find a case cited by UnitedHealth and attached to its motion to be particularly pertinent to this issue – the *HCA-Healthone LLC v. Marel Norwood* decision attached as Defendant's Exhibit 22.  In that case, Marel Norwood sought registration on the mark depicted as HEALTH ONESELF in standard character format, which registration was opposed by HealthONE.  The TTAB found that while Marel Norwood attempted to narrow the protection of HealthONE's marks based upon a list of 18 third-party registrations having the words "health" and "one" (or the numeral "1") registered in connection with health-related goods and services, the TTAB found that this factor was "at best for applicant, a neutral factor."  *Id.* at 11.  It stated:

> While it is true that the other marks all contain the words "One" and "Health," all have quite different commercial impressions than that created by applicant's and registrant's marks, and in most cases, involve very different goods and services. . . . In any event, third-party registrations are not evidence that such marks are in use or that consumers are familiar with them. . . . . Apart from use analogous to a dictionary entry, these third-party registrations cannot be given great weight in determining the strength of a registration.

Id. at 15-16.  I find this analysis instructive here.

Another measure of strength is the marketplace recognition value of the mark. *Big O Tires*, 167 F. Supp. 2d at 1226. Plaintiffs assert that the HEALTHONE® marks have significant marketplace recognition in HealthONE's primary service areas, establishing the commercial strength of the marks. HealthONE is the largest hospital system in Denver, and it has presented evidence that many of its programs and affiliated physicians are award winning and world renowned. Indeed, one of UnitedHealth's subsidiaries, UnitedHealthcare, has designated two HealthONE facilities as "Premium Cardiac Speciality Centers." HealthONE advertises and markets its services nationally and internationally, which is relevant to the analysis of commercial strength. *Id.* at 1227. On an annual basis, HealthONE spends approximately seven to ten million dollars promoting its brand. *See Fortune Dynamic, Inc. v. Victoria's Secret Stores Brand Mgmt., Inc.*, 618 F.3d 1025, 1034-35 (9th Cir. 2010) (finding sufficient commercial strength based in part on advertising spending of approximately $350,000 annually); *A & H Sportswear Co., Inc. v. Victoria's Secret Stores, Inc.*, 57 F. Supp. 2d 155, 165-66 (E.D. Pa. 1999) (marketing and promotion efforts equivalent to approximately $1.5 million annually supported a finding of conceptual strength), *aff'd in relevant part*, 237 F.3d 198, 224 (3d Cir. 2000)). Finally, HealthONE spends significant money on community benefits, supporting its argument that it has strength commercially.

Based on the foregoing, I find that HealthONE's marks are strong commercially, but are weak conceptually. Accordingly, I find that this factor is neutral, not favoring either party on the issue of likelihood of confusion.

3.      Third Factor - The Intent of the Alleged Infringer

Although intent to infringe is not necessary in order to show likelihood of

confusion, evidence of intent on the part of the infringer raises an inference of

infringement, at least in a direct confusion case where the infringer intends to pass its

goods off as the products of Plaintiff.  *Beer Nuts I*, 711 F.2d at 941.  Thus, "[i]f an

alleged infringer adopted its mark for the purpose of deriving benefit from a plaintiff's

existing mark, this intent weighs firmly in the plaintiff's favor."  *Heartsprings, Inc.*, 143

F.3d at 556.  The Tenth Circuit in *Universal Money Centers* stated that "[a]lthough the

'deliberate adoption of a similar mark may lead to an inference of intent to pass off

goods as those of another which in turn supports a finding of likelihood of confusion,'

[citation omitted], 'mere knowledge [of a similar mark] should not foreclose further

inquiry.'"  22 F.3d at 1532.  "'The proper focus [remains] whether defendant had the

intent to derive benefit from the reputation or goodwill of plaintiff."  *Id.*

I find no evidence in this case to support an inference that UnitedHealth adopted

the mark "UNIVERSALHEALTHONE" with the intent to derive benefit from the

HealthONE mark.  While UnitedHealth undisputedly knew about HealthONE's federally

registered marks through its survey, the trademark report it commissioned, and the

cease and desist letter sent from HealthONE, this is simply not enough to establish

intent.

Instead, the uncontroverted evidence demonstrates that UnitedHealth undertook

a long, detailed, and thorough rebranding initiative, lasting almost a year, before

choosing a name to unify the brand under which its various subsidiaries sold individual

insurance products.  It engaged the services of an outside branding consultant to conduct market research and focus groups in order to test the response to a number of proposed names.  At the end of this process, the name UnitedHealthOne was selected because it performed best (or at least well) in those market tests and because it leveraged the goodwill associated with UnitedHealth's own name.  Further, it was in alignment with a common naming convention in the industry, used by other major insurers with marks such as HumanaOne and CoventryOne.  HealthONE does not offer any admissible evidence contradicting these facts.  I also find that the fact that UnitedHealth has spent more than $40 million annually on marketing, $4.9 million of which is spent on UNITEDHEALTHONE products and services, "strongly suggests that [it] is relying on its own publicity and reputation, and not on that of [HealthONE]." *Universal Money Ctrs.*, 22 F.3d at 1532.

HealthONE argues, however, that Defendant commissioned a trademark clearance report which included references to the HealthONE mark.  It fails to acknowledge, however, that this 500+ page report contains references to dozens of federally registered marks with combinations of the words "health" and "one," including another federally registered "HealthOne" mark that has no association with Plaintiffs, along with scores of other business listings and Internet domain names using "health one" in various permutations.  And I find no evidence from Defendant's knowledge of the survey that it intended to benefit from HealthONE's mark.[4]

---

[4]  To the extent HealthOne relies on the opinion of its expert Kenneth Germain on the issue of UnitedHealth's intent, I find that this is improper.  By Order of January 12, 2012, I struck Mr. Germain's proposed testimony as to how UnitedHealth or its attorneys analyzed the search report or what they likely

HealthONE also points to the fact that the two businesses have a history with each other, and that UnitedHealth sends clients to HealthONE.  On that issue, the evidence shows that under the terms of a managed care contract, UnitedHealth's insureds can obtain health care services from HealthONE, and that between September 2008 and September 2011, over 5,000 UnitedHealthOne insureds visited one of HealthONE's hospitals.  HealthONE asserts that when the parties have a prior history with each other, the inference of intent is "especially strong", citing *Beer Nuts, Inc. v. Clover Club Foods Co.*, 805 F.2d 920, 927 (10th Cir. 1986) ["*Beer Nuts II*"].  Again, however, I find nothing in the record to support an inference that this relationship between the parties somehow contributed to UnitedHealth's decision to adopt the "UNITEDHEALTHONE" mark.

Based on the foregoing, I find that this factor weighs in favor of UnitedHealth and against a finding of likelihood of confusion.

### 4.    Fourth Factor - Similarities and Differences Between the Services

"Typically, '[t]he greater the similarity between the products and services, the greater the likelihood of confusion.'"  *King of the Mountain*, 185 F.3d at 1092 (quoting *Universal Money Ctrs.*, 22 F.3d at 1532).  The Tenth Circuit has also noted that "the greater the degree of overlap in the marketing approaches of the two entities, the greater the likelihood of confusion."  *Heartsprings*, 143 F.3d at 556.  "The marketing practices of the parties are particularly relevant in a trademark infringement case

---

did or did not think of its contents.  Accordingly, I find that Mr. Germain's opinion is inadmissible as to the UnitedHealth decision makers' intent in light of their knowledge of the report's contents.  And I find that Mr. Germain's opinion regarding what he would have advised if he had been asked is irrelevant to the issue of UnitedHealth's subjective intent.

because these practices directly impact the way in which consumers experience the parties' respective marks." *Id.* "In analyzing the similarity in the manner of marketing, this court has previously considered whether the parties were competitors in consumer markets." *Sally Beauty Co.*, 304 F.3d at 974.

In the case at hand, UnitedHealth argues that the only products marketed under the UnitedHealthOne mark are individual insurance products.  The mark is not used to market hospital or clinical services.  On the other hand, HealthONE uses its marks for hospital and clinical services but does not sell insurance.  Thus, UnitedHealth argues that the services for which the marks at issue are used are different.  I disagree, finding that this factor favors a likelihood of confusion.

HealthONE has presented evidence that UnitedHealth does not use the UNITEDHEALTHONE mark solely on insurance products, but co-brands the mark with hospital and health care services through Optum brands.  Through its Optum subsidiaries, UnitedHealth owns and operates medical practice groups, clinics, retail clinics, urgent care centers, ambulatory surgery centers, and provides nursing home, hospice, and palliative care services.  UnitedHealth also provides management services to a variety of health care providers around the country.  In Denver, UnitedHealth supports or employs physicians, offers hospice services, and even attempted to purchase a large physician group.  HealthONE's President and CEO testified that UnitedHealth's activities in this regard are competitive with HealthONE.  Thus, construing the evidence in the light most favorable to HealthONE, the parties could be

deemed to be competitors as a result of UnitedHealth's expansion into the provision of health care services.

I further note that UnitedHealth Group Incorporated (and not the particular UnitedHealth subsidiaries selling UNITEDHEALTHONE products) is the entity seeking to register the UNITEDHEALTHONE mark. UnitedHealth's trademark application does not restrict UnitedHealth's use of this name to any particular subsidiaries or entities affiliated with UnitedHealth. Moreover, UnitedHealth's trademark registration is broad, covering in addition to insurance services "managed health care services, including 'healthcare in the maintenance of health maintenance organizations.'" (Pls.' Ex. 4, United's Trademark Registrations.)

Further, as HealthONE points out, however, direct competition is not *sine qua non* for this factor because trademark rights extend to "non-competing but 'related' goods." *Team Tires Plus, Ltd. v. Tires Plus, Inc.*, 394 F.3d 831, 833-34 (10th Cir. 2005). Under the related goods doctrine, the appropriate inquiry is whether the goods and services of the parties are related in the minds of consumers, not whether the goods and services are directly competitive. *Id.* at 834-35. This issue "is not limited as to confusion of consumers as to the source of goods, but also includes confusion as to sponsorship or affiliation. . . . ." *Id.* at 835. Thus, confusion can exist if consumers believe that an affiliation or sponsorship exists between the parties. *Id.*; *see also Brookfield Commc'ns, Inc. v. West Coast Entm't Corp.*, 174 F.3d 1036, 1056 (9th Cir. 1999) ("[T]he focus is on whether the consuming public is likely somehow to associate [the infringer's] products with [the senior user's products].").

HealthONE asserts that even if this Court considers the scope of UnitedHealth's products and services in the most narrow context as limited to health insurance products, those insurance products are sufficiently related to HealthONE's health care services and establish a likelihood of confusion. I agree. Numerous cases considering this exact issue have recognized the potential for confusion between health insurance and health care services. *See, e.g., WorldCare Ltd. Corp. v. World Ins. Co.*, No. 8:11CV99, 2011 WL 1770445, at *7 (D. Neb. May 9, 2011); *In Re Health1 Ins. Servs., Inc.,* Ser. No. 76630041, 2007 WL 4287244, at *3-4 (T.T.A.B. 2007); *In re HealthFirst, Inc.*, Ser. Nos. 75/117,256 and 75/117,694, 2000 TTAB LEXIS 128, *7 (T.T.A.B. Feb. 16, 2000); *Humana Inc. v. Humanomics, Inc.*, TTAB Opp. No. 71,097, 1987 WL 124301,*9 (T.T.A.B. 1987).

My finding is supported by a decision of the TTAB cited by UnitedHealth, wherein it stated:

> It is settled that it is not necessary that the respective services be identical or even competitive in order to support a finding of likelihood of confusion. Rather, it is sufficient that the services are related in some manner, or that the circumstances surrounding their marketing are such, that they would be likely to be encountered by the same persons in situations that would give rise, because of the marks used thereon, to a mistaken belief that they originate from or are in some way associated with the same source or that there is an association or connection between the sources of the respective services. *In re Telephone & Telegraph Corp.*, 197 SPQ 910 (TTAB 1978).

*Humana Inc. v. Aetna Inc.*, TTAB Opp. Proc. 91192704, Oct. 13, 2010 Opinion, at attached as Def.'s Ex. 23, at 7. In that case, Humana's services were "underwriting insurance for pre-paid health care; insurance underwriting in the field of health administration of pre-paid health care plans; organizing pre-paid health care." Aetna's

services were "managed health care services." *Id.* at 7.  The TTAB stated, "[o]bviously, both parties' services involve the provision of health care." *Id.*  It therefore found that Aetna's services as identified in its applications are related to the services identified in Humana's registrations, and that this "factor weighs in favor of a finding of likelihood of confusion." *Id.* at 8.  I find that the same analysis applies here.

I also find that source confusion is all the more likely here because, construing the evidence in the light most favorable to HealthONE, it appears that UnitedHealth has blurred the line between its health insurance products and health care services in connection with its marketing.  For example, UnitedHealth describes itself on its website as a "health care company".  Other examples are United's "Grow Healthy" and "Health in Numbers" advertising campaigns, which suggest to the public that UnitedHealth provides health care services to patients.  Plaintiffs' expert has opined that UnitedHealth's marketing strategy may lead consumers to believe that the HealthONE and UNITEDHEALTHONE services are offered by a single source.  (Pls.' Ex. 82, Englis Rep. at 10-11:  "[T]here is ample evidence that United's advertising is, at best, unclear as to the true nature of its business (health insurance products and services, and not health care), and, at worst, misleading to consumers.")

Finally, I find that UnitedHealth and HealthONE have taken very similar approaches to marketing, using the same types of media, maintaining extensive marketing and advertising budgets, and targeting identical customers in the same geographic areas.  It is undisputed that UnitedHealth and HealthONE advertise through identical media sources including direct mail, television, radio, newspapers, magazines,

billboards, websites, Internet banners and search engines, and distribution of

promotional items.  HealthONE's marketing efforts extend not only to the Rocky

Mountain region, but also nationally and internationally, consistent with UnitedHealth's

marketing.  Both companies have developed sophisticated on-line marketing strategies,

rendering the scope of their marketing efforts borderless.  More importantly, HealthONE

and UnitedHealth target the exact same types of people—namely, individuals who need

health care services.  *See Humanomics Inc.*, 1987 WL 124301, at *9.  As a result of

HealthONE's marketing efforts, patients come to HealthONE facilities from all over the

country and internationally.  Likewise, United's UNITEDHEALTHONE products are

offered throughout the country.

Again, I find the TTAB's opinion in *HCA-Healthone LLC v. Marel Norwood* to be

instructive.  *See*, Def's Ex. 22.  It examined "the similarity or dissimilarity of the trade

channels in which and the purchasers to whom applicant's services and opposer's

services. . .are marketed."  *Id.* at 8.  The TTAB found that Humana's services are

presumed to travel in all the normal channels of trade for health insurance underwriting

services, and that its "services could be directed to or at least be encountered by

individuals or companies who are purchasers or users of [Aetna's] managed health care

services."  *Id.*  Accordingly, that factor was found to weigh in favor of finding a likelihood

of confusion.  *Id.* at 9.  I find that this analysis applies equally in this case.

Based on the foregoing, I find that a reasonable juror could conclude that the

services offered through the marks are substantially similar.  A reasonable juror could

also conclude that the parties' marketing strategies are similar.  Accordingly, I find that

this factor weighs in favor of a finding of likelihood of confusion, and against UnitedHealth.

      5.    <u>Fifth Factor - The Consumer's Degree of Care</u>

According to the Tenth Circuit, "[a] consumer exercising a high degree of care in selecting a product reduces the likelihood of confusing similar trade names." *Heartsprings*, 143 F.3d at 557.  In *Heartsprings*, the product at issue was the selection of an expensive school for developmentally developed children, for which the Tenth Circuit held that a high degree of care existed.  Other expensive items for which more care is typically taken include "upscale homes . . . , mattresses; furnaces; air conditioning units; home septic tank systems; sets of silverware; pleasure boats; driving instructions; high-priced cigars; expensive pianos;. . . cameras; carpets . . . ."  McCarthy § 23:97.  On the other hand, "'[b]uyers typically exercise little care in the selection of inexpensive items that may be purchased on impulse.'"  *Beer Nuts II*, 805 F.2d at 928 (quotation omitted).

I find no evidence to support HealthONE's argument that buyers exercise little care in selecting health insurance, other than self-serving testimony from its own representatives.  Instead, as noted by UnitedHealth, the TTAB found in the *Humana, Inc.* decision that "[b]ecause the decision to purchase healthcare insurance and related services involves both the quality of the services and a significant financial commitment, purchasers are likely to exercise greater care and know with whom they are dealing."  *Humana, Inc. v. Aetna, Inc.*, Def.'s Ex. 23 at 9.  As further noted in that case, "'[i]t is common knowledge that even ordinary consumers tend to exercise some sophistication

when it comes to decisions relating to healthcare and healthcare insurance services.'"

*Id.* (quotation omitted).

I agree with the TTAB and find that consumers are likely to exercise a higher degree of care in purchasing health insurance given the importance of the decision to purchase individual insurance products, coupled with the relatively high dollar amounts associated with those products. As noted by UnitedHealth, individual insurance policies are not sold "off the shelf." Further, health insurance is not an inexpensive purchase, with an average consumer expecting to pay an average monthly premium of approximately $260 for about three years. Before signing up for an insurance policy, the consumer is presented with various coverage options that must be considered and expressly selected. And, one of the product's purposes is to secure the insured's assets against the possibility of a catastrophic loss related to otherwise "out of pocket" medical expenses. Under these circumstances, I find that consumers would exercise a higher degree of care in making a purchase of an insurance policy.[5] Accordingly, I find that this factor weighs in favor of UnitedHealth, and against a likelihood of confusion.

### 6.   Sixth Factor - Evidence of Actual Confusion

Although not necessary to prevail on a trademark infringement claim, "evidence of actual confusion in the marketplace may be the best indication of likelihood of

---

[5]  The primary case cited by HealthOne in support of its argument to the contrary is not persuasive. *See Meridian Mut. Ins. Co. v. Meridian Ins. Group, Inc.*, 128 F.3d 1111, 1117 (7th Cir. 1997). The Seventh Circuit in that case found for purposes of a preliminary injunction motion that purchasers of health insurance did not exercise a great deal of care when corresponding with their insurance company, and that this lack of care could lead plaintiff's clients to mistakenly contact the defendant. However, the evidence supporting that finding was the fact that checks were made out to "Meridian Insurance" instead of "Meridian Mutual Insurance Company". The case is clearly distinguishable based on the facts.

confusion." *Sally Beauty Co.*, 304 F.3d at 974; *see also King of the Mountain*, 185 F.3d at 1092.  However, "evidence of some actual confusion does not dictate a finding of likelihood of confusion." *Universal Money Ctrs.*, 22 F.3d at 1535.  "'[I]solated instances of actual confusion [may] be de minimis.'" *King of the Mountain*, 185 F.3d at 1092 (quoting *Universal Money Ctrs.*, 22 F.3d at 1535).

As noted by McCarthy's treatise on Trademarks:

Evidence of only a small number of instances of actual confusion can be dismissed as inconsequential or *de minimis*. . . . Evidence of actual confusion of a very limited scope may be dismissed as *de minimis*:  "Probable confusion cannot be shown by pointing out that at someplace, at some time, someone made a false identification." . . . Evidence of the number of instances of actual confusion must be placed against the background of the number of opportunities for confusion before one can make an informed decision as to the weight to be given the evidence. If there is a very large volume of contacts or transactions which could give rise to confusion and there is only a handful of instances of actual confusion, the evidence of actual confusion may receive relatively little weight.

*Id.* § 23.14 (internal footnotes omitted).  The treatise also states that "'the law has long demanded a showing that the allegedly infringing product carries with it a likelihood of confounding an appreciable number of reasonably prudent purchasers exercising ordinary care.'" *Id.* (quotation omitted).

In the case at hand, viewing the evidence in the light most favorable to HealthONE, I assume that the six anecdotal incidents relied on by HealthONE "constitute some evidence of actual confusion." *Universal Money Ctrs.*, 22 F.3d at 1535.  However, I find these evidence of actual confusion to be de minimis.  *See King of the Mountain*, 185 F.3d at 1092 (seven examples of actual confusion is de minimis).

HealthONE's six isolated examples must be placed in the context of the thousands of known instances in which consumers of UnitedHealth's individual insurance policies encounter HealthONE's marks in the marketplace. On that issue, since the introduction of the UnitedHealthOne brand in September of 2008, there have been approximately 28,000 UnitedHealth individual insurance policy holders in Colorado at any one time. Nearly 5,000 of those policy holders have sought treatment in HealthONE-branded hospitals. Taken in that context, the instances of confusion identified by HealthONE are de minimis.

I also note that after this dispute arose, UnitedHealth conducted an extensive search of the entry points where its consumers might show any confusion, including its call centers and complaint lines, among other logical contact points. UnitedHealth also put in place measures to monitor any complaints or confusion regarding HealthONE coming through its call centers. No instances of reported confusion were found or reported. And, given the nature of the encounters between UnitedHealthOne members and HealthONE hospitals, I agree with Defendant that it is unlikely that instances of actual confusion would have gone unreported. Hospital stays and insurance claims are significant events in highly regulated industries where the providers are required to keep track of consumer complaints.

Based on the foregoing, I find that HealthONE's "[d]e minimis evidence of actual confusion [from the anecdotes it relies on] does not establish the existence of a genuine issue of material fact regarding likelihood of confusion". *United Money Ctrs.*, 22 F.3d at 1535. This is especially true where, as here, UnitedHealth "has introduced substantial,

reliable evidence in support of its motion for summary judgment demonstrating no significant actual confusion in the marketplace." *Id.*

HealthONE also, however, relies on surveys conducted by experts on both sides that it argues establish a lack of actual confusion.  UnitedHealth argues that the surveys do not demonstrate actual confusion, as the surveys resulted in a measurement of confusion of between 6% and 8%, well below the 10% threshold that is widely accepted by federal courts as evidence of a lack of confusion.[6]  I find that HealthONE's evidence constitutes evidence of actual confusion.

The Tenth Circuit has indicated that evidence of actual confusion "may be introduced through surveys, although their evidentiary value depends on the methodology and questioned asked."  *Sally Beauty Co.*, 304 F.3d 964, 974 (10th Cir. 2002).  Again, however, the survey evidence may be de minimis.  *Id.*  The standard for de minimis confusion in connection with surveys has been stated as follows:

> When the percentage results of a confusion survey dip below 10%, they can become evidence which will indicate that confusion is not likely. The Seventh Circuit, reviewing prior cases involving low percentage results, found that 7.6% is "a factor weighting against infringement." Similar low percentage figures have been relied upon to support a finding of no likelihood of confusion and no infringement.

McCarthy § 32:189.  Consistent with this, a 6.7% confusion level from a survey has been found to be de minimis as a matter of law.  *Sally Beauty Co.*, 304 F.3d at 974.

---

[6]  UnitedHealth asserts that its expert, Dr. Linda Golden, found from her survey that only 7.56% of the survey respondents indicated any confusion or potential confusion as to the source, affiliation or sponsorship of the services marketed under the UnitedHealthOne mark. HealthONE's expert, Dr. Basil Englis, used a different method for his survey and, according to UnitedHealth, derived confusion rates essentially the same as those determined by Dr. Golden:  6% among respondents shown HealthONE's logo mark and 8% among those shown HeathONE's block letter mark.

UnitedHealth asserts that when the overall confusion levels in his survey came back too low to support HealthONE's case—because the tested confusion was too low and the control confusion was, to use his words, "very high," (Def.'s Ex. 27, Dep. of Dr. Basil Englis Dep. at 175-177), HealthONE's expert Dr. Englis conducted what he described as a second survey.  (Def.'s Ex. 25 at 23.)  Under this second survey or "test", Dr. Englis came up with a final confusion measure of 11.7% for HealthONE's block letter mark and 13.1% for its logo mark.  UnitedHealth argues that because those results are based on marks and descriptors that do not actually appear anywhere in the marketplace, and because of the fundamentally flawed and contrived nature of the method employed, they cannot create a genuine issue of material fact with respect to likelihood of confusion regarding the marks at issue in this case.

HealthONE asserts in response that UnitedHealth grossly misrepresents the results of the surveys conducted by the survey experts.  It argues that its survey expert, Dr. Basil Englis, an internationally recognized and widely published expert in consumer research, found more than legally sufficient levels of likely confusion.  According to HealthONE, Dr. Englis' methodology consisted of showing respondents side-by-side images of the UNITEDHEALTHONE mark and HEALTHONE® Mark and then probing for confusion.  This methodology was described by UnitedHealth as "well-established (Motion for Summary Judgment at 21), and has been endorsed by many courts.  *See, e.g., Squirt Co. v. Seven-Up Co.*, 628 F.2d 1086 (8th Cir. 1980).

Dr. Englis conducted two types of studies:  a Logo Study and a Block Letters Study.  In the Logo study the HealthONE mark was shown in the form in which it is used

by HealthONE in the marketplace.  The name UnitedHealthOne was shown using the

logo form that UnitedHealth uses in the marketplace.  In the Block Letters Study the

marks were shown in a block letter format using a sans-serif typeface. (Pls. Ex. 82,

Dr. Englis Report at 16.)  The respondents were randomly assigned to either a "test"

group or a "control" group.  The test group was shown the HEALTHONE® Mark and the

UNITEDHEALTHONE mark either as used in the marketplace or in block letters.  (*Id.* at

17-18.)  The "control" group was shown the UNITED HEALTHONE mark and the

HEALTHONE mark in either form, but with the word "One" deleted from

UNITEDHEALTHONE, *e.g.*, "UnitedHealth."  HealthONE asserts that the use of a

control group is standard practice in trademark surveys to assess the effects of

respondents' pre-existing beliefs or knowledge and of background noise.

After being shown the respective marks, the respondents were asked questions

to determine levels of confusion.  The level of confusion of the control group was then

subtracted from the level of confusion of the test group to determine the "net confusion,"

the actual likelihood of consumer confusion. (Ex. 82, Englis Rep. at 16-17.)  According

to HealthONE, the result was a finding of substantial confusion for all groups–from 25%

to 55%, but a net confusion of 9.2% for the Logo Study and 11.3% for the Block Letters

Study, percentages that Dr. Englis recognized as "statistically significant."  (*Id.* at 21-

22.)

HealthONE asserts that after conducting these surveys and observing that the

levels of confusion in the control group were "extraordinarily high," Dr. Englis concluded

that the control group marks "did not adequately control for consumers' prior beliefs or

knowledge." (Ex. 82, Englis Rep. at 22.) He further concluded that consumers' prior beliefs and knowledge were impaired by UnitedHealth's substantial marketing efforts whereby it blurred its identity as an insurance company. (*Id.*) Accordingly, he decided that a more accurate survey of the net confusion caused by UnitedHealth's use of HealthONE's trademark should include in the control group marks an identification of the markets in which the owners of the marks operated. The purpose of this was "to control for any pre-existing consumer beliefs about the industry in which United operates." (*Id.* at 23.)

Dr. Englis then replicated his initial survey, according to HealthONE, but added below the UnitedHealthOne mark in the control group the following: "A company which is authorized to issue health insurance policies," and added below the HealthONE mark in the control group the following: "A company which is authorized to operate hospitals." HealthONE asserts that the results of that survey demonstrated continuing elevated confusion in the control group, and increased net confusion levels for the Logo and Block Letters Studies of 19.1% and 17.3%. (Ex. 82, Englis Rep. at 24-25.) It further asserts that the percentages of net confusion found by Dr. Englis' surveys exceed the so-called "threshold" level of 10% UnitedHealth claims as sufficient to establish a likelihood of confusion.

HealthONE also asserts as equally important that Dr. Englis reviewed the responses that UnitedHealth's expert reported in her survey, and concluded that those responses had been mischaracterized in the survey results. In UnitedHealth's survey, respondents were shown only the UNITEDHEALTHONE mark and asked two "closed-

ended" questions: (1) "Based on what you see on the card and from what you know, is

the company affiliated, connected, or associated with any other person or company?";

(2) "From what you know, should the company have to get permission or approval from

any other person or company to use what you see on the card?"  Only "yes" answers

were considered to demonstrate confusion.  HealthONE asserts that Dr. Englis

concluded that these questions were badly designed to detect confusion.  (Pls.' Ex. 82,

Englis Rep. at 28).

To determine whether the respondents actually were confused, Dr. Englis

analyzed the answers to the "openended" questions that all respondents were asked:

"Why do you say that?"  HealthONE contends that by this process, Dr. Englis concluded

that 16.4% of respondents actually were confused.  ( *Id.* at 29.)  He then determined

that the respondents who comprised that 16.4% "mentioned some form of entity that

provides direct medical services (hospitals, doctor's offices, etc.) or they mentioned

'HealthONE' in response to either [of] [the open-ended] questions."  (Ex. 82, Englis

report at 29).  Accordingly, by Dr. Englis' calculation, more than 10% of the respondents

in the UnitedHealth survey also were confused by UnitedHealth's use of the

HEALTHONE® Marks.  In an expert report submitted as part of the TTAB proceeding,

Dr. Englis found many other defects in the UnitedHealth survey conducted by

Dr. Golden.  (*See* Pls.' Ex. 83, Critique of Linda J. Golden Report in the Matter of

HealthONE and UnitedHealthOne trademarks.)

Construing the evidence in the light most favorable to HealthONE as I must for

purposes of the summary judgment motion, I find that HealthONE has submitted actual

evidence of confusion from its expert Dr. Englis in the form of survey results that appear

to be statistically significant.  While UnitedHealth criticizes Dr. Englis' survey and his

analysis of UnitedHealth's survey, I do not have sufficient information at this stage of the

litigation to be able to make a determination as to whether Dr. Englis' methodology or

results were flawed.  Further, it appears that this is essentially a "battle of the experts".

The Tenth Circuit has stated that "at the summary judgment stage of litigation, a court

cannot decide that [an expert] is not a credible witness."  *Abilene Retail #30, Inc. v. Bd.

of Comm'rs*, 492 F.3d 1164, 1188 (10th Cir. 2007).  A battle of the experts generally

requires a trial and a trier of fact to resolve.  *Id.*; *see also Phillips v. Cohen,* 400 F.3d

388, 399 (6th Cir. 2005) (reversing summary judgment order, where trial court weighed

the evidence of competing experts:  "[C]ompeting expert opinions present the 'classic

battle of the experts' and it [is] up to the jury to evaluate what weight and credibility each

expert opinion deserves.")(citations omitted).

UnitedHealth also argues, however, that HealthOne's response reflects a lack of

candor to the Court in that Dr. Englis retracted at his deposition the higher calculations

relied on by HealthONE and instead adopted the percentages opined to by

UnitedHealth's expert.  (Def.'s Ex. 25. Dr. Englis Dep. at 160:20-166:2.)  Thus, it argues

that both sides' experts now agree that the relevant confusion is below ten percent with

respect to the marks as they are actually used, and that the survey evidence does not

create a genuine dispute of material fact.

I reject this argument for purposes of summary judgment.  I do not read the

testimony of Dr. Englis in his deposition as narrowly as UnitedHealth.  It does not

appear that Dr. Englis testified that his figures were inaccurate or that he retracted them. Instead, he testified that even if he accepted UnitedHealth's expert Dr. Golden's computation versus his own, he would reach the same conclusion that there is a likelihood of confusion statistically. (Def.'s Ex. 25 at 160:18-161:14.) While he stipulated that he was willing to use Dr. Golden's calculations of 6% for net total confusion (*id.* at 161:15-24, 163:1-4), he also testified he would use his own report and figures therein for other purposes, some of which resulted in a likelihood of confusion over the 10% threshold articulated by UnitedHealth. (*Id.* at 1635:166:2.) I find that this is something that must sorted out by the fact finder at trial, and is not grounds for me to simply discount Dr. Englis' opinions.

In conclusion, construing the evidence in the light most favorable to HealthONE, I find that Plaintiffs have presented evidence of actual confusion. Accordingly, I find that this factor weighs in favor of finding a likelihood of confusion for purposes of the summary judgment motion, and against Defendant UnitedHealth.

### 7.   Conclusion as to Likelihood of Confusion

In conclusion on the issue of likelihood of confusion regarding HealthONE's treademark claim, three of the six factors used to determine a likelihood of confusion favor HealthOne. These include the similarity of the mark, similarities of the products and services, and evidence of actual confusion. The factor regarding the strength of the mark is neutral, and the other two factors – the consumer's degree of care and UnitedHealth's intent in adopting its mark – favor UnitedHealth.

"However, the determination of a likelihood of confusion requires more than counting the number of factors in favor of each side." *Water Pic, Inc. v. Med-Systems, Inc.*, No. 2012 WL 224447, at *12 (D. Colo. Jan. 25, 2012).  "It requires the Court to take into account the proper weight that each factor should be assigned." *Id.*; *see also Heartsprings,* 143 F.3d at 558 (finding that, because no single factor is dispositive, all relevant factors must be weighed, properly analyzed and considered together for a court to determine the likelihood of confusion).  In this regard, I given great weight to the similarity of the marks and evidence of actual confusion, as they are two of the most important factors.  *See Hi–Tech Pharms., Inc. v. Herbal Health Prods., Inc.,* 132 Fed. App'x 348, 350 (11th Cir.2005) (per curiam) (type of mark and actual confusion are "most weighty" considerations); *see also Sally Beauty Co.*, 304 F.3d at 974; *King of the Mountain,* 185 F.3d at 1091.  When I also factor in the similarities in the services, I find from these three factors that a reasonable jury could return a verdict for HealthONE, and that these factors outweigh the factors that favor UnitedHealth.

Accordingly, I find that HealthONE has demonstrated a genuine issue of material fact on the likelihood of confusion.  Defendant's Motion for Summary Judgment is denied as to the trademark infringement claim as well as Plaintiffs' other claims that require a showing of likelihood of confusion.

D.   HealthONE's CCPA Claim

UnitedHealth also argues that it is entitled to judgment as a matter of law on HealthONE's CCPA claim, because HealthONE has not shown that UnitedHealth's use of the UnitedHealthOne mark "significantly impacts the public as actual or potential

consumers of the defendant's goods, services, or property." *Rhino Linings USA, Inc. v. Rocky Mountain Rhino Lining, Inc.*, 62 P.3d 142, 147 (Colo. 2003). As support for its argument, UnitedHealth contends that HealthONE has not adduced any evidence of an adverse impact on Colorado consumers of UnitedHealth's individual insurance policies stemming from the use of the mark by UnitedHealthOne.

HealthONE notes in response that public impact can be shown by misrepresentations that are "directed to the market generally, taking the form of widespread advertisement." *Hall v. Walter*, 969 P.2d 224, 235 (Colo. 1998). Advertising that "potentially affects a large swath of the public via television, print media, radio, and the internet" can support a CCPA claim. *Crowe v. Tull*, 126 P.3d 196, 209 (Colo. 2006). HealthONE argues that UnitedHealth spends a great deal of money on national advertising for the UNITEDHEALTHONE mark, including television, print media, radio, direct mail and internet, reaching a widespread number of Colorado consumers of health insurance and health care services. Moreover, it asserts that the public deserves to have a clear understanding of the source of their health care services and health care insurance, as both are essential to public health, particularly given the ever-changing and complex field of health care. Accordingly, HealthONE contends that summary judgment is inappropriate on this claim as well.

I agree with UnitedHealth that summary judgment should be granted as to the CCPA claim because I find that Plaintiff has not shown a significant or adverse impact to the public. While HealthONE asserts that UnitedHealth advertised on a nationwide basis, it has not presented any evidence of actual misrepresentations made in this

advertising.  It also has not presented any evidence of false or deceptive advertising.

While I found in this Order that there are genuine issues of fact as to whether the

UNITEDHEALTHONE mark is likely to cause confusion, use of that mark in advertising

does not alone translate into false or deceptive advertising.  Otherwise, any trademark

dispute in which the defendant advertises using the disputed mark is eligible for redress

under the CCPA.  No authority supports such a sweeping extension of the CCPA.

IV.    CONCLUSION

Based upon the foregoing, it is

ORDERED that Defendant's Motion for Summary Judgment filed on January 6,

2012 (ECF No. 52) is **GRANTED** as to the claim asserted under the Colorado

Consumer Protection Act and **DENIED** in all other respects.

Dated:  May 30, 2012

BY THE COURT:

s/ Wiley Y. Daniel
Wiley Y. Daniel
Chief United States District Judge